**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone:  (619) 237-3490
Fiske@GomezTrialAttorneys.com

**BARON & BUDD, P.C.**
Scott Summy (pending *Pro Hac Vice*)
(Texas Bar No. 19507500)
Celeste Evangelisti (SBN 225232)
Carla Burke (pending *Pro Hac Vice*)
(Texas Bar No. 24012490)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

GREENFIELD MHP ASSOCIATES, L.P., a limited partnership; STARLIGHT MHP, LLC, a California limited liability company; STARLIGHT EXCHANGE, LLC, a Delaware limited liability company; DAVIS GROUP EXCHANGE, LLC, a Delaware limited liability company; VILLA CAJON MHC, L.P., a Utah limited partnership,

                    Plaintiff,

         v.

AMETEK, INC., a Delaware corporation; SENIOR OPERATIONS LLC, a limited liability company; and DOES 1 through 100, inclusive,

                    Defendants.

Case No.:     **'15CV1525 L     WVG**

**COMPLAINT FOR:**

1. **Negligence**
2. **Gross Negligence**
3. **Public Nuisance**
4. **Private Nuisance**
5. **Trespass**
6. **Trespass- Extrahazardous Activity**
7. **Strict Liability- Ultrahazardous Activity**

**DEMAND FOR A JURY TRIAL**

Plaintiffs allege the following:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter because all Plaintiffs own subject properties located in San Diego County, California.

2.      This Court has personal jurisdiction over the Defendants because Defendants do business in California, Defendants have minimum contacts in California, and otherwise purposefully avail themselves of the markets in this state through the research, development, manufacture, promotion, advertising, sale, and marketing of products and services in California, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

3.      This Court has jurisdiction because Defendants have or have had their principal place of business and/or own or have owned real business property in El Cajon, California.

4.      This Court has jurisdiction based on diversity jurisdiction.

5.      Venue is further proper in this Court in that the subject acts and transactions giving rise to this action occurred in the County of San Diego for the following reasons:

a.   Defendants have conducted or do conduct business in the County of San Diego and have intentionally availed themselves of the laws and markets within San Diego County by owning and operating, or having owned and operated, the subject aerospace plant which is the source of the subject contamination;

b.   Defendants do substantial business within the County of San Diego still;

c.   Defendants are subject to personal jurisdiction in the County of San Diego; and

d.   The injury and harm to Plaintiffs, as owners of property in San Diego County, occurred within the County of San Diego in the City of El Cajon.

## PARTIES

6.      Plaintiff GREENFIELD MHP, L.P., a limited partnership, owns Greenfield Mobile Estates, located at 400 Greenfield Drive, El Cajon, California 92021 ("GREENFIELD").

7.      Plaintiff STARLIGHT MHP, LLC, a California limited liability company, STARLIGHT EXCHANGE, LLC, a Delaware limited liability company, and DAVIS GROUP EXCHANGE, LLC, a

GOMEZ TRIAL
ATTORNEYS

Delaware limited liability company, own Starlight Mobile Home Park, located at 351 E Bradley Avenue, El Cajon, California 92021 ("STARLIGHT").

8.      Plaintiff VILLA CAJON MHC, L.P., a Utah limited partnership, owns Villa Cajon Mobile Home Estate, located at 255 E Bradley Ave., El Cajon, CA 92021 ("VILLA CAJON").

9.      Defendant AMETEK, INC. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1100 Cassatt Road, Berwyn, Pennsylvania 19312 ("AMETEK").

10.     Defendant SENIOR OPERATIONS LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 300 East Devon Avenue, Bartlett, Illinois 60103.  SENIOR OPERATIONS LLC wholly owns a division named SENIOR AEROSPACE KETEMA, which is located at 790 Greenfield Drive, El Cajon, California 92021 ("KETEMA").

11.     Unless otherwise indicated, the use of any Defendant's name in this Complaint, including "Defendants," includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

12.     The true names and capacities of the defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, governmental, associate or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Each of the Doe Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence or otherwise, for the occurrences herein alleged, and Plaintiff's harm was legally caused by conduct of the Doe Defendants.  Does 1 through 100, inclusive, are responsible to Plaintiff on the facts and theories herein alleged.  At all relevant times, each Defendant, including those fictitiously named, was the agent, servant, and/or employee of each of the remaining Defendants, and was acting within the course and scope of said agency and employment.  Each of the Defendants is in some manner responsible for the events and happenings to which reference is made herein, and each Defendant caused injury and damage to Plaintiff as herein alleged.  The acts of Defendants and each of them were and are the acts of the other

1   Defendants. Defendants, and each of them, ratified, authorized, and/or approved of the acts of the

2   other Defendants.

3                                 **FACTUAL ALLEGATIONS**

4   **Companies' History**

5           13.     In 1953 or 1954, the AMETEK PROPERTY was founded by California Aircraft

6   Products on the current El Cajon, California site, at 790 Greenfield Drive, El Cajon, California 92021.

7   In 1964, California Aircraft Products changed its name to Straza Industries, which was purchased by

8   Defendant AMETEK in 1968.[1]

9           14.     AMETEK used the AMETEK PROPERTY to manufacture aircraft engine parts from

10  1968 to 1988.[2]

11          15.     Currently, the AMETEK PROPERTY is owned by Defendant Senior Operations, LLC,

12  apparently doing business as SENIOR AEROSPACE KETEMA, which has its principal place of

13  business at 790 Greenfield Drive, El Cajon, California 92021 ("KETEMA").[3]

14          16.     KETEMA is AMETEK spelled backwards.

15  **AMETEK Dumped Chlorinated Solvents into a Hole in the Ground**

16          17.     In 1963, Straza/AMETEK dug a hole in the ground, which was 12 feet in diameter and

17  10 feet deep.  This hole was used as a waste "SUMP."[4]

18          18.     Straza/AMETEK lined the walls of the SUMP with redwood planks and poured concrete

19  at its base.  This SUMP was AMETEK'S waste storage system until 1985.[5]

20          19.     Between 1963 and 1985, for 22 years, Straza/AMETEK dumped up to 7,000 gallons of

21  waste per month into this SUMP.  This dumped waste included[6]:

22

23  [1] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability
    Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790
24  Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-
    201, dated September 2008.
    [2] *Id.*
25  [3] SENIOR AEROSPACE KETEMA website, www.saketema.com/history.
    [4] California Regional Water Quality Control Board, San Diego Region, Technical Analysis, Administrative Liability
26  Complaint No R9-2008-0033, Issued to Ametek, Inc., Former Ametek/Ketema Aerospace Manufacturing Facility, 790
    Greenfield Drive, El Cajon, California, San Diego County, For Violation of Cleanup and Abatement Order No, R9-2002-
27  201, dated September 2008.
    [5] *Id.*
28

a.   Spent acid and alkaline solutions

b.   Industrial chlorinated solvents

c.   1, 1, 1- Trichloroethane (1, 1, 1- TCA)

d.   Trichloroethylene (TCE)

e.   Tetrachloroethylene (PCE)

f.   Oils

g.   Paint thinner

h.   Process Sludge

20.   In 1963, Straza/AMETEK submitted a Report of Waste Discharge (ROWD) to the California Regional Water Quality Control Board in order to receive authority and permission to use the SUMP as an impervious storage vessel.  Straza/AMETEK represented to the Regional Water Quality Control Board that their waste treatment facility would "prevent filtering into native soil" in a February 7, 1963 letter.[7]

21.   Straza/AMETEK did not reveal the nature or design of the SUMP, excluding the details that the SUMP was lined with redwood planks. It was not until removal of the SUMP, decades later, that the San Diego County Department of Environmental Health discovered and photographed the redwood planks.[8]

22.   Highly acidic liquid waste, spent chlorinated solvents, and appreciable amounts of various metallic wastes breached the sump and discharged into soil surrounding the sump and into the groundwater, as Straza/AMETEK dumped the chlorinated solvent waste into the SUMP until 1985.[9]

23.   Between 1963 and at least 1985, the strong, acidic liquid waste deteriorated the SUMP allowing the chlorinated solvent waste to seep and percolate into the surrounding soil, fractures in the granite rock, and into the groundwater.[10]

---

[6] Id.
[7] Id.
[8] Id.
[9] Id.
[10] Id.

24.     In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).[11]

25.     In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).[12]

26.     The 1987 and 2007 concentration levels exceed state water quality objectives by unthinkable magnitudes.  A chart from the Regional Water Board's 2008 Administrative  Liability Complaint illustrates the excessive pollution caused by AMETEK:[13]

a.

### Table 1

| Waste Constituent | Ground-Water Concentration [a] (ug/l) | Basin Plan Water Quality Objective (ug/l) |
|---|---|---|
| Tetrachloroethylene (PCE) | 5,400 | 5 |
| Trichloroethylene (TCE) | 40,000 | 5 |
| 1,1-Dichloroethylene (1,1-DCE) | 1,300 | 6 |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 270 | 200 |
| 1,4 - Dioxane | 800 | 3* |

\* California Department of Public Health advisory Notification Level (NL).
[a] Data from the December 2007 Groundwater Monitoring Report.

### Largest TCE Plume in the State of California

27.     AMETEK'S waste discharge caused the largest TCE plume in the State of California.[14]

28.     The chlorinated solvent plumes are massive, extending 1.3 miles westward and down-gradient.  The plumes include the following chemicals and dimensions[15]:

a.   TCE: 7,000 feet by 1,600 feet, migrated beneath 257 acres of land

b.   DCE: 3,200 feet by 1,200 feet, migrated beneath 88 acres of land

c.   Dioxane: 5,600 by 1,000 feet, extends across 128 acres of land

d.   TCA: 1,200 feet by 400 feet, extends beneath 11 acres

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

29.     Additionally, plumes of PCE, 1,1-DCA, benzene, toluene, ethylbenzene, and xylene exist in the groundwater.[16]

30.     According to AMETEK'S consultants, ERM, the plume has contaminated the groundwater and soil beneath Magnolia Elementary School, GREENFIELD, STARLIGHT, and other neighboring properties.

**AMETEK'S Water Quality Violations**

31.     The California Regional Water Quality Control Board filed the 2008 Administrative Liability Complaint against Defendant AMETEK, INC. for failing to comply with the previous 2002 Cleanup and Abatement Order No. R9-2002-201.[17]  AMETEK, INC. committed the following violations[18]:

     a.  Failure to Report as Required by Directive No. 1: "Ametek failed to install and collect ground-water samples in accordance with Directive 1.e and failed to submit a complete Delineation Report by April 30, 2003….. the total number of days of violation is 1,974 days."

     b.  Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3: "Ametek failed to submit a complete Feasibility Study Report by January 16, 2004….. the total number of days of violation is 1,713 days."

32.     The California Regional Water Quality Control Board then imposed a fine of $2,269,000 for the above mentioned violations[19]:

     a.  **"$1,671,500 in liability for Failure to Report as Required by Directive No. 1…."**

     b.  **"$597,500 in liability for Failure to Submit a Complete Feasibility Study Report as Required by Directive No. 3…."**

/ / /

/ / /

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

GOMEZ TRIAL
ATTORNEYS

1

**Knowing, Willful, and Intentional Failure to Cleanup and Abate the Contamination**

2   33. AMETEK knowingly, willfully, and intentionally failed to establish monitoring wells,

3 which were intended to identify the boundaries of and delineate the massive plume.  In the 2008

4 Administrative Liability Complaint, the California Water Board documented AMETEK'S willful,

5 knowing, and intentional failures[20]:

6   a. "After 20 years of investigation efforts, Ametek and S&K have not installed a

7    sufficient monitoring well network to delineate the vertical and horizontal extent of

8    the waste plume and have not taken any efforts to cleanup and abate the effects of

9    their discharge."

10   b. "Ametek and S&K are responsible for delineating and remediating the discharge of

11    wastes."

12   c. "Ametek and S&K were repeatedly advised that their submittals regarding plume

13    delineation were incomplete or deficient, yet they failed to conduct additional work

14    to address the deficiencies."

15   d. "Ametek and S&K's failure to completely delineate the plume has allowed

16    significant concentrations of contaminants to remain in place as a continued source

17    of pollution."

18   e. "Ametek and S&K failed to act appropriately, not only in their efforts to complete

19    the delineation of the plume, but in their responsibilities to implement appropriate

20    cleanup and abatement measures in a reasonable amount of time."

21   f. "Such failures have caused a condition of pollution and contamination in the ground

22    water beneath the El Cajon Valley with continuing impacts to the existing beneficial

23    uses of the Santee/El Monte Basin."

24 / / /

25 / / /

26 / / /

27

28 [20] Technical Analysis for Administrative Liability Complaint No. R9-2008-0033, September 2008.

GOMEZ TRIAL
ATTORNEYS

**Toxic Vapor Intrusion**

34.     In 2008, the Department of Toxic Substances Control (DTSC) entered into a Consent Order with AMETEK, documenting the following[21]:

a.     "In June 2007, samples taken from ground water monitoring wells showed concentration of TCE of up to 50,000 micrograms per liter beneath the former Ketema facility, and up to 3,600 micrograms per liter beneath the Site."[22]

b.     "The corresponding modeled indoor air exposure at this level corresponds to a lifetime cancer risk in excess of one-in-ten-thousand ($10^{-4}$) at the Site.  The TCE groundwater plume is impacting the Site."

c.     "Soil gas and indoor air quality sampling conducted between July 2004 and August 2005 at the Site showed TCE concentrations in the subsurface at up to 130 parts per billion by volume and inside the classrooms at levels up to 1.6 micrograms per cubic meter, as reported in "Results of Soil Vapor and Air Testing" dated May 27, 2005, and the "Results of Indoor Air Sampling" dated August 26, 2005."

d.     "Exposure at this level corresponds to a lifetime cancer risk in excess of one-in-a-million ($10^{-6}$)."

35.     In 2008, the DTSC identified the "Health Effects" of the chlorinated solvents and chemicals AMETEK had dumped into its SUMP[23]:

a.     "Volatile Organic Compounds (VOCs) detected at the former Ketema facility and the Site include: 1) benzene, 2) chlorinated solvents, such as TCE, PCE, and 1,1 DCE."

/ / /

/ / /

---

[21] Consent Order, Department of Toxic Substances Control, California Environmental Protection Agency, Docket No. HAS-CO 07/08-198, 2008.

[22] "Site" means Magnolia Elementary School.

[23] *Id*.

COMPLAINT

GOMEZ TRIAL
ATTORNEYS

b.  "Exposure to such chemicals may occur by inhalation of vapors coming from soil and groundwater, as well as ingestion of, and dermal contact with, VOCs in soil or water."

c.  "Potential health effects include cancer, liver and kidney damage, respiratory impairment and central nervous system effects."

36.  In 2008, the DTSC identified the "Routes of Exposure" of those chlorinated solvents and chemicals[24]:

a.  "Certain activities conducted at the former Ketema facility have contaminated soil and groundwater.  Because the contaminants found on the former Ketema facility and under the Site include VOCs, an assessment of all exposure routes will be conducted."

b.  "The potential routes of exposure include inhalation, ingestion, and dermal contact."

37.  In 2008, the DTSC also identified the "Public Health and/or Environmental Risks"[25]:

a.  "Contaminants have been found in the soil and groundwater at the former Ketema facility and the Site.  Risks from these contaminants may be caused by exposure to soil vapor, soils and/or groundwater, through ingestion, inhalation of dusts, and/or vapors, and dermal contact."

b.  "The groundwater is relatively shallow at the Site and indoor from groundwater via soil vapor was confirmed at the Site."

38.  Since 2012, the DTSC has recommended quarterly monitoring of indoor air quality in classrooms and quarterly monitoring of soil gas at Magnolia Elementary School.[26]

/ / /

/ / /

/ / /

---

[24] *Id.*
[25] *Id.*
[26] Letter to Mr. James Beard, Cajon Valley School District, from Shahir Haddad, P.E., Supervising Engineer, Department of Toxic Substances Control, November 17, 2014.

GOMEZ TRIAL
ATTORNEYS

**Toxic Vapor Intrusion- A Recent History**

39.   In November 2014, the DTSC evaluated indoor air quality test results:[27]

    a.   "Detection of TCE within one room (Room 8) exceeded the accelerated response action level for residential exposure scenarios (2 ug/m3)…."

    b.   "PCE was detected in indoor air within several rooms, with one detection in Room 19 (3.1 ug/m3) exceeding DTSC's modified air screening level for industrial exposure scenarios (2.08 ug/m3) and two detections (Rooms 11 and 19) exceeding DTSC's modified air screening level for residential exposure."

    c.   "Analysis of several indoor air contaminants (PCE, TCE, 1,1-DCE, 1,1,1-TCA, and 1,1-DCA) which likely appear in indoor air due to vapor intrusion and are found in nearby soil vapor wells, using a Schools Risk Screening Model (Schoolscreen, developed by the Office of Environmental Health Hazard Assessment (OEHHA)) indicates that both cancer risks and health hazards to on site staff and students may approach or exceed DTSC's points of departure for cancer risk (1 in one million excess risk) and hazards (hazard index of 1.0)."

40.   In November 2014, the DTSC made conclusions and recommendations: [28]

    a.   "Recent sampling of indoor and ambient air is consistent with vapor intrusion from contaminants in the subsurface into classrooms at Magnolia Elementary School."

    b.   "Precautionary actions should be taken to increase ventilation in all classrooms."

    c.   "In order to confirm detections of contaminants within indoor air, an additional round of air sampling should be performed as soon as possible."

    d.   "HERO (Human and Ecological Risk Office) supports the recommendation of a human health risk assessment for staff and students at Magnolia Elementary School."

/ / /

---

[27] *Id*, attached Memorandum, SOIL VAPOR SURVEY AND INDOOR AIR QUALITY ASSESSMENT, From Patrick Kerzic, PhD, DABT, Staff Toxicologist, November 3, 2014.
[28] *Id.*

**The December 2014 Vapor Intrusion Air Quality Test Results**

41.     After November 2014, in December 2014, indoor air quality was tested, and the results showed a spike in indoor air vapor intrusion.

42.     On May 7, 2015, the DTSC held a Community Update Meeting for Magnolia Elementary School, at which several teachers and parents of Magnolia students attended.  The DTSC interpreted results from the December 2014 vapor intrusion test results.

43.     As part of the meeting, the DTSC gave a presentation, including the following slides and information[29]:

44.



45.



[29] Presentation at Community Update Meeting for Magnolia Elementary School, Schools Evaluation and Brownfields Outreach, California Department of Toxic Substances Control, May 7, 2015.

GOMEZ TRIAL
ATTORNEYS

46.

## Previous Sampling Events and Results

|  | Cancer Risk | Additional Risk in One Million |
|---|---|---|
| August 2014 | $4.5 \times 10^{-6}$ | 4.5 |
| December 2014 | $4.2 \times 10^{-5}$ | 42 |
| March 2015 | $5.6 \times 10^{-6}$ | 5.6 |



Department of Toxic Substances Control

47.

## DTSC's Risk Management Range



Highest cancer risk estimated Dec 2014: $4.2 \times 10^{-5}$

Highest cancer risk estimated March 2015: $5.6 \times 10^{-6}$

Source: DTSC Vapor Intrusion Public Participation Advisory

Department of Toxic Substances Control

GOMEZ TRIAL
ATTORNEYS

48.     The cancer risk for the December 2014 and the March 2015 levels are above the "ACCEPTABLE" range.  The cancer risk for the December 2014 levels are in the red.

49.     The cancer risk appears to reach levels 42 times the threshold that guides the DTSC.

**Students and Teachers Exposed to Toxic Vapor Intrusion**

50.     Since at least 1985, and most likely prior to 1985, students and teachers at Magnolia Elementary School have been exposed to toxic vapor intrusion due to AMETEK'S dumping of chlorinated waste into the SUMP.

51.     Most likely, the vapor intrusion was even more significant 20 or 30 years ago because the groundwater contamination levels were higher—they were almost twenty times in 1987 what they were in 2007:

      a.   In 1987, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 810,000 parts per billion (ppb).

      b.   In 2007, total chlorinated solvent concentrations in the groundwater near the SUMP exceeded 48,000 parts per billion (ppb).

**Toxic Health Effects**

52.     The Agency for Toxic Disease Registry and U.S. Environmental Protection Agency provide information for some of these toxins[30]:

      a.   TCE: *Affected Organ Systems*: Developmental (effects during periods when organs are developing), Neurological (Nervous System); *Cancer Classification*:  NTP: Reasonably Anticipated to be a Human Carcinogen; EPA: Carcinogenic to humans; IARC: Carcinogenic to humans (evidence for cancer is based on kidney cancer, limited evidence for non-Hodgkin lymphoma and liver cancer, as well as, various tumors in animals); *Chemical Classification*: Volatile organic compounds; *Summary:* Trichloroethylene (TCE) is a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste. It is used mainly as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint

---

[30] www.atsdr.cdc.gov

removers, typewriter correction fluids, and spot removers. Trichloroethylene is not thought to occur naturally in the environment. However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

b. PCE: *Affected Organ Systems:* Developmental (effects during periods when organs are developing), Neurological (Nervous System), Respiratory (From the Nose to the Lungs); *Cancer Classification:* NTP: Reasonably Anticipated to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Tetrachloroethylene (PCE) is a manufactured chemical that is widely used for dry cleaning of fabrics and for metal-degreasing. It is also used to make other chemicals and is used in some consumer products.

c. TCA: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Neurological (Nervous System); *Chemical Classification:* Volatile organic compounds; *Summary:* 1,1,1-Trichloroethane is a synthetic chemical that does not occur naturally in the environment. It also is known as methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

d. DCE[31]: *Affected Organ Systems:*  Short-term: EPA has found 1,1-DCE to potentially cause the following health effects when people are exposed to it at levels above the MCL for relatively short periods of time: liver damage.  Long-term: 1,1-DCE has the potential to cause the following effects from a lifetime exposure at levels above the MCL: liver and kidney damage, as well as toxicity to the developing fetus; cancer; *Summary:* 1,1-DCE will evaporate from soil and will leach into the groundwater where its fate is unknown, but degradation is expected to be slow. Its tendency to accumulate in aquatic life is unknown but expected to be minor.

e. Dioxane: *Affected Organ Systems:* Hepatic (Liver), Ocular (Eyes), Renal (Urinary System or Kidneys); *Cancer Classification:* NTP: Reasonably Anticipated to be a

---

[31] www.epa.gov

Human Carcinogen; *Summary:*  1,4-Dioxane is a clear liquid that easily dissolves in water. It is used primarily as a solvent in the manufacture of chemicals and as a laboratory reagent; 1,4-dioxane also has various other uses that take advantage of its solvent properties.

    f.   Vinyl Chloride: *Affected Organ Systems:* Cardiovascular (Heart and Blood Vessels), Developmental (effects during periods when organs are developing), Hepatic (Liver), Immunological (Immune System); *Cancer Classification:* NTP: Known to be a Human Carcinogen; *Chemical Classification:* Volatile organic compounds; *Summary:* Vinyl chloride is a colorless gas. It burns easily and it is not stable at high temperatures. It has a mild, sweet odor. It is a manufactured substance that does not occur naturally. It can be formed when other substances such as Trichloroethane (TCA), trichloroethylene (TCE), and tetrachloroethylene (PCE) are broken down. Vinyl chloride is used to make polyvinyl chloride (PVC). PVC is used to make a variety of plastic products, including pipes, wire and cable coatings, and packaging materials. Vinyl chloride is also known as chloroethene, chloroethylene, and ethylene monochloride.

**Greenfield, Starlight, and Villa Cajon Mobile Home Parks**

53.    GREENFIELD is a mobile home park located due west of the AMETEK PROPERTY and directly west of Magnolia Elementary School.  As such, GREENFIELD is directly west and down-gradient of the AMETEK SUMP.

54.    STARLIGHT is a mobile home park located due west-northwest of the AMETEK PROPETY and north-northwest of Magnolia Elementary School.  As such, STARLIGHT is northwest and down-gradient of the AMETEK SUMP.

55.    VILLA CAJON is a mobile home park located due west-northwest of the AMETEK PROPERTY and west-northwest of Magnolia Elementary School.  As such VILLA CAJON is west-northwest and down-gradient of the AMETEK SUMP.

56.    Below is a Google Map of the affected neighborhood.  The industrial buildings surrounding and including the blue roofs are part of the AMETEK/KETEMA property.  The

neighborhood is east of the 67 Freeway and north of Greenfield Drive, and includes land within the City of El Cajon and the County of San Diego.



/ / /

/ / /

/ / /

57.     According to AMETEK's own environmental consultants, Environmental Resources Management ("ERM"), the chlorinated solvent plume, including TCE and other chemicals, flows directly underneath GREENFIELD, STARLIGHT, and VILLA CAJON.

58.     Below is a "zoom" view of the same map, showing the shared property lines among AMETEK/KETEMA, Magnolia Elementary School, Starlight Mobile Home Park, and Greenfield Mobile Home Estates:



/ / /

/ / /

/ / /

59.     ERM, hired by AMETEK, created this map below, showing TCE concentrations in the Alluvium and Decomposed Granite layers of sub-surface soil:

     a.  "Figure 7A, TCE Concentrations in Groundwater, (Alluvium and DG), First Quarter 2015, Former Ketema A&E Facility, 790 Greenfield Drive, El Cajon, California:"



/ / /

/ / /

/ / /

60.     ERM, hired by AMETEK, documents the following TCE concentrations in the Alluvium and Decomposed Granite layers of sub-surface soil, at the following Monitoring Wells ("MW").

a.   MW-40, located near the property boundary of the AMETEK PROPERTY, STARLIGHT, and Magnolia Elementary School, reveals TCE concentrations of 19,000 micrograms per Liter:



///

///

///

GOMEZ TRIAL
ATTORNEYS

b. MW-16, located near the property boundary of Magnolia Elementary School, STARLIGHT, and GREENFIELD, reveals TCE Concentrations of 1,800 micrograms per Liter, as sampled during the "previous" Fourth Quarter of 2014.



c. ERM sampled MW-16 in the Third Quarter of 2014 and recorded TCE concentrations of 2,300 micrograms per Liter.



61.     ERM identifies concentration contours of the TCE plume in the First Quarter of 2015, shown in the blue lines below.  The contours reveal concentrations of TCE underneath GREENFIELD and STARLIGHT at or above 1,000 micrograms per Liter, or at or above 100 micrograms per Liter:



62.     As seen above in paragraph 60.a., ERM identifies a contour of TCE concentration levels in excess of 10,000 micrograms per Liter underneath STARLIGHT, near the property boundary of Magnolia Elementary, the AMETEK PROPERTY, and STARLIGHT.

63.     ERM identifies concentration contours of the TCE plume in the Third Quarter of 2014 and the First Quarter of 2015, below.  Samples from MW-18, on the eastern border of VILLA CAJON, in the Second Quarter of 2014 show TCE concentrations of 300 micrograms per Liter.  Samples from MW-18 in the Fourth Quarter of 2014 show TCE concentrations of 210 micrograms per Liter.

 

GOMEZ TRIAL
ATTORNEYS

64.     AMETEK's consultants, as recent as 2015, document groundwater contamination of TCE and other chemicals underneath GREENFIELD, STARLIGHT, and VILLA CAJON.

65.     Based on information and belief, TCE and other chlorinated solvent chemicals at KETEMA or underneath the KETEMA property continue to cause groundwater contamination, which flows down-gradient and westward into and beneath GREENFIELD, STARLIGHT, and VILLA CAJON.

66.     Based on information and belief, a continuous release of toxic chemicals is occurring every day due to a constant source of chemicals underneath the KETEMA property.  Based on information and belief, the constant source of chemicals underneath the KETEMA property continuously contaminates the groundwater as it passes westward underneath the KETEMA property and into and beneath the Plaintiffs' properties.

67.     Based on information and belief, KETEMA knows and has known that its property, including the subsurface soil, alluvium, decomposed granite, and granitic bedrock, are all contaminated with pure TCE and other chemicals.  Based on information and belief, KETEMA knows and has known that pure TCE and other chemicals beneath its property has been and continues to be a constant source and supply of toxic chemicals, which continue to contaminate the groundwater as it passes through the property's subsurface soils, and despite this knowledge, KETEMA has consciously ignored the risk of further contamination and has chosen not to clean up or remediate the pure TCE and other chemicals.

### First Cause of Action

### Negligence

### (Against All Defendants)

68.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 61.

69.     Plaintiffs were and continue to be harmed by Defendants' negligent conduct as described above.

70.     Plaintiffs were and continue to be harmed by Defendants' negligent above-described conduct.

/ / /

COMPLAINT

GOMEZ TRIAL
ATTORNEYS

71.     Defendants' negligent above-described conduct was a substantial factor in causing Plaintiffs' harm.

72.     Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**Second Cause of Action**

**Gross Negligence**

**(Against All Defendants)**

73.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 66.

74.     Plaintiffs were harmed by Defendants' negligent above-described conduct as described above.

75.     Plaintiffs were and continue to be harmed by Defendants' negligent above-described conduct.

76.     Defendants' negligent above-described conduct was a substantial factor in causing Plaintiffs' harm.

77.     Defendants' above-described conduct lacked any care whatsoever and was an extreme departure from what reasonably careful companies would do.

78.     Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**Third Cause of Action**

**Public Nuisance**

**(Against All Defendants)**

79.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 72.

80.     Plaintiffs suffered harm because Defendants created a nuisance, which is a continuing nuisance.

81.     Defendants, by acting and failing to act, created and/or failed to prevent the toxic chemical contamination, a condition that was harmful to health, and indecent and offensive to the

senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life.

82.     The above-described toxic chemical contamination has affected a substantial number of people at the same time.

83.     An ordinary person would be reasonably annoyed or disturbed by the above-described toxic chemical contamination.

84.     The seriousness of the harm outweighs the social utility of Defendants' above-described conduct.

85.     The Plaintiffs did not consent to Defendants' above-described conduct.

86.     Plaintiffs suffered and continue to suffer harm different from the type of harm suffered by the general public;

87.     Defendants' above-described conduct was a substantial factor in causing Plaintiffs' harm.

88.     Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## Fourth Cause of Action

### Private Nuisance

### (Against All Defendants)

89.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 82.

90.     Defendants interfered with Plaintiffs' use and enjoyment of their land.

91.     Plaintiffs owned the above-described GREENFIELD and STARLIGHT properties.

92.     Defendants, by acting and/or failing to act, created and/or failed to prevent toxic chemical contamination, a condition a condition that is harmful to health, indecent and/or offensive to the senses, and is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and/or property.

93.     This toxic chemical contamination is a condition that interfered with Plaintiffs' use and enjoyment of their land.

94. The above-described nuisance is a continuing nuisance.

95. Plaintiffs did not consent to Defendants' above-described conduct.

96. An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

97. Plaintiffs' were and continue to be harmed.

98. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

99. The seriousness of the harm outweighs the public benefit of Defendants' conduct.

100. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

## Fifth Cause of Action

### Trespass

### (Against All Defendants)

101. Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 94.

102. Defendants trespassed on Plaintiffs' property.

103. Plaintiffs own the GREENFIELD and STARLIGHT properties.

104. Defendants' intentionally, recklessly, and negligently entered Plaintiffs' property by intentionally, recklessly, and negligently causing and/or allowing chlorinated solvents and other chemicals to enter the subsurface soil and groundwater of Plaintiffs' property.

105. Plaintiffs did not give permission for the entry.

106. The above-described trespass is a continuing trespass.

107. Plaintiffs were and continue to be harmed.

108. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

109. Defendants' conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

/ / /

/ / /

/ / /

/ / /

**Sixth Cause of Action**

**Trespass- Extrahazardous Activity**

**(Against All Defendants)**

110.    Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 103.

111.    Plaintiffs own the above-described GREENFIELD and STARLIGHT properties.

112.    Defendants engaged in the extrahazardous activity of using, dumping, and/or maintaining toxic chemicals on its property as described above.

113.    Defendants use, dumping, and/or maintaining toxic chemicals on its property as described above caused toxic chemicals to enter onto and beneath plaintiffs' property.

114.    Plaintiffs did not give permission for the entry.

115.    The above-described trespass is a continuing trespass.

116.    Plaintiffs were and continue to be harmed.

117.    Defendants above-described conduct was a substantial factor in causing Plaintiffs' harm.

118.    Defendants' above-described conduct was willful, knowing, and reckless, warranting punitive and exemplary damages.

**Seventh Cause of Action**

**Strict Liability- Ultrahazardous Activity**

**(Against All Defendants)**

119.    Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 112.

120.    Defendants were and/or are engaged in the ultrahazardous activity of using, dumping, and/or maintaining toxic chemicals on their property as described above.

121.    Plaintiffs were and continue to be harmed.

122.    Plaintiffs harm was the kind of harm that would be anticipated as a result of the risk created by using, dumping, and/or maintaining toxic chemicals on its property.

/ / /

GOMEZ TRIAL
ATTORNEYS

123.   Defendants using, dumping, and/or maintaining toxic chemicals on their property was a substantial factor in causing Plaintiffs' harm.

124.   WHEREFORE, Plaintiffs demand judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit as allowed by law, and such other and further relief as this Court deems just and proper.

## DELAYED DISCOVERY AND EQUITABLE TOLLING

125.   At all times relevant herein, Defendants concealed relevant facts that would have allowed Plaintiff to discover the true nature and degree of the waste dumping, groundwater contamination, and vapor intrusion.  As a result of these misrepresentations, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiffs.  Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiffs with respect to the true nature, quality, and hazards of use of the waste dumping, groundwater contamination, and vapor intrusion as described herein and above.

126.   Plaintiffs exercised due diligence to discover Defendants' wrongdoing.  However, such wrongdoing and/or the full extent and degree of such wrongdoing was not reasonably discoverable prior to the date of the filing of this action and/or prior to three years prior to the filing of this action since Defendants concealed their wrongdoing through misrepresentation, concealment, and failure to disclose.  Plaintiffs exercised due diligence by promptly filing this Complaint after discovering the facts giving rise to these claims.

127.   Plaintiffs did not discover the true nature and degree of waste dumping, groundwater contamination, and/or the vapor intrusion until very recently, and certainly within three years, when the DTSC held a community meeting on May 7, 2015, to disclose recent air quality test results; and/or Plaintiffs did not discover the true nature and degree of waste dumping, groundwater contamination, and/or the vapor intrusion until recently, and certainly within three years, when newspaper articles reported on the matter in mid to late 2014.

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants, and each of them, and that Plaintiffs be awarded damages under all causes of action, from Defendant, and each of them, as follows:

      a.   Under all Causes of Action as allowable by law, compensatory damages;

      b.   Under all Causes of Action as allowable by law, damages based on diminution of value of property;

      c.   Punitive damages;

      d.   Statutory post-judgment interest allowable by law;

      e.   Costs of this suit allowable by law;

      f.   Reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, as allowed by law; and,

      g.   Awarding any and all other relief that this Court deems necessary or appropriate.

DATED: July 9, 2015                **GOMEZ TRIAL ATTORNEYS**

                           By: /s/ John P. Fiske
                               John H. Gomez
                               John P. Fiske

                               **BARON & BUDD, P.C.**
                               Scott Summy
                               Celeste Evangelisti
                               Carla Burke

**Trial by Jury**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury.


DATED:  July 9, 2015                                          **GOMEZ TRIAL ATTORNEYS**


                                                             By:  /s/ John P. Fiske_____
                                                                  John H. Gomez
                                                                  John P. Fiske

                                                             **BARON & BUDD, P.C.**
                                                             Scott Summy
                                                             Carla Burke
                                                             Celeste Evangelisti