1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

GREENFIELD MHP ASSOCIATES, L.P., A limited partnership; STARLIGHT MHP, LLC, a California limited liability company; STARLIGHT EXCHANGE, LLC, a Delaware limited liability company; DAVIS GROUP EXCHANGE, LLC, a Delaware limited liability company; VILLA CAJON MHC, L.P., a Utah limited partnership,

Plaintiffs,

v.

AMETEK, INC., a Delaware corporation; SENIOR OPERATIONS, LLC, a limited liability company; and DOES 1 through 100, inclusive,

Defendants.

CASE NO. 3:15-cv-1525-GPC-BGS

**ORDER:**

**GRANTING IN PART AND DENYING IN PART DEFENDANT AMETEK'S MOTION TO DISMISS**

[ECF No. 24]

**GRANTING IN PART AND DENYING IN PART DEFENDANT SENIOR OPERATION'S MOTION TO DISMISS**

[ECF No. 23]

Before the Court are Defendant Ametek, Inc. ("Ametek") and Defendant Senior Operations, LLC's ("Senior" or "Senior Operations") separate Motions to Dismiss. Def. Ametek's Mot. Dismiss ("Am. Mot."), ECF No. 24; Def. Senior Operations' Mot.

Dismiss ("Sen. Mot."), ECF No. 23. The motions have been fully briefed.[1] *See* Pls.'

Opp'n Def. Ametek's Mot. Dismiss ("Am. Opp."), ECF No. 28; Reply Pls.' Opp'n Def.

Ametek's Mot. Dismiss ("Am. Reply"), ECF No. 32; Pls.' Opp'n Def. Senior

Operations' Mot. Dismiss ("Sen. Opp."), ECF No. 29; Reply Pls.' Opp'n Def. Senior

Operations' Mot. Dismiss ("Sen. Reply"), ECF No. 33.

Upon consideration of the moving papers and the applicable law, and for the

foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Ametek's

Motion to Dismiss and **GRANTS IN PART** and **DENIES IN PART** Senior

Operation's Motion to Dismiss.

## FACTUAL BACKGROUND

This case arises out of the dumping of toxic waste by Defendants and their

predecessors into a temporary waste storage tank (or "sump") on their property on

Greenfield Drive in El Cajon, California ("Ametek property"). Am. Compl. ("Compl.")

4, ECF No. 17. Aircraft engine parts were manufactured in the Greenfield facility from

1953 or 1954, when the facility was founded by California Aircraft Products ("CAP"),

until 1988. *Id.* at 4. In 1964, CAP changed its name to Straza Industries. *Id.* at 4.

Defendant Ametek purchased Straza Industries in 1968. *Id.* Defendant Senior

Operations subsequently purchased the Ametek property in or around 1998. Am. Mot.

Exs. 2–3.

Plaintiffs allege that from 1963 to 1985, owners of the Ametek property used a

sump to temporarily store toxic waste which consisted of a 12 feet in diameter and 10

feet deep hole in the ground. Compl. 5. The hole was lined with redwood planks on the

sides and had a poured concrete base. *Id.* Plaintiffs allege that between 1963 and 1985,

---

[1] The Court notes that it does not dismiss the case despite the fact that Plaintiffs' briefing consisted largely of recitations of the Complaint and the California Civil Jury Instructions without reference to the applicable law, and despite the fact that one of Plaintiffs' briefs wrongly discussed the plaintiffs and facts from the related case *Trujillo v. Ametek*, No. 3:15-cv-1394-GPC-BGS. *See, e.g.*, Sen. Opp. 8, 13–22. Plaintiffs are cautioned that bare recitations of the required elements of each cause of action do not suffice as briefing at the motion to dismiss stage, and that counsel are expected to support their positions with relevant legal precedent.

1  Defendants or their predecessors dumped up to 7,000 gallons of waste per month into
2  the sump, including (a) spent acid and alkaline solutions; (b) industrial chlorinated
3  solvents; (c) 1, 1, 1,- tricholorethane ("TCA"); (d) trichloroethylene ("TCE"); (e)
4  tetrachloroethylene ("PCE"); (f) oils; (g) paint thinner; and (h) process sludge. *Id.* at
5  5.  Perhaps unsurprisingly given the nature of the sump, Plaintiffs allege that the waste
6  stored therein deteriorated and breached the sump, resulting in toxic waste seeping and
7  percolating into the surrounding soil, fractures in the granite rock, and into the
8  groundwater over the subsequent years. *Id.* at 6.

9     Plaintiffs allege that Defendants' waste discharge caused a massive waste plume,
10  including the largest TCE plume in the State of California. *Id.* at 7. Plaintiffs allege that
11  the plume "extend[s] 1.3 miles westward and down-gradient" and includes large
12  amounts of TCE, 1,1-dichloroetyhlene ("DCE"), dioxane, and TCA, as well as smaller
13  amounts of PCE, 1, 1-dichloroethane ("DCA"), benzene, toluene, ethylbenzene, and
14  xylene. *Id.*

15     State authorities have been aware of the waste discharge from the Ametek
16  property since at least the 1980's. *Id.* at 9. In 2008, the California Regional Water
17  Quality Control Board for San Diego County ("Water Board"), which oversees the
18  identification and monitoring of groundwater contamination, remediation, and ensuring
19  compliance with California Water Code, *see, e.g.*, 23 C.C.R. § 640; 23 C.C.R. § 2907;
20  Cal. Water C. § 13300, et seq, filed an Administrative Liability Complaint which
21  charged Defendants with failure to install a sufficient monitoring well network to
22  delineate the extent of the waste plume and failure to take "any efforts to cleanup and
23  abate the effects of their discharge" despite "20 years of investigation efforts" and
24  Defendants being "repeatedly advised" that their monitoring and remediation efforts
25  were deficient. *Id.* at 9. The Complaint stated that Defendants "fail[ure] to act
26  appropriately" had resulted in "a condition of pollution and contamination in the
27  ground water beneath the El Cajon Valley with continuing impacts to the existing
28  beneficial uses of the Santee/El Monte Basin." *Id.* The California Department of Toxic

1   Substances Control ("DTSC"), which has oversight of remediation of toxic
2   contamination, has also been monitoring the waste plume. *Id.* at 10.

3       Greenfield, Starlight, and Villa Cajon are mobile home parks due west, west-
4   northwest, and west-northwest respectively of the Ametek facility. *Id.* at 23, 25.
5   Plaintiffs allege that the mobile home parks are down-gradient of the Ametek facility
6   and the waste plume flows directly underneath all three mobile home parks. *Id.* at 24.

7       Magnolia Elementary School ("Magnolia") is immediately adjacent to the
8   Ametek property and directly in-between the mobile home parks and the Ametek
9   facility. *Id.* at 25. Plaintiffs allege that the waste plumes are also directly beneath
10  Magnolia. *Id.* On May 7, 2015, DTSC held a Community Update Meeting at Magnolia
11  where the agency presented results from ongoing monitoring of toxic vapor intrusion
12  into the school. *Id.* at 13. The presentation included information as to how vapors from
13  toxic plumes can enter cracks in the ground of a building and affect the indoor air
14  quality. *Id.* The presentation explained that PCE is a carcinogen and TCE is a
15  "carcinogen, reproductive and developmental toxin." *Id.* at 14. The presentation also
16  showed that the cancer risk from toxic vapor intrusion inside Magnolia was increasing,
17  from 4.5 parts per million in August 2014 to 5.6 parts per million in March 2015, with
18  a temporary spike in December 2014 to 42 parts per million. *Id.* at 15. Finally, the
19  DTSC presentation included a slide showing that the cancer risk level was veering from
20  the "Acceptable" (no further action required) to "Unacceptable" (further action
21  required) range during this time, although the cancer risk level had not yet crossed the
22  threshold into the "Unacceptable" zone. *Id.* In the intermediate zone where the cancer
23  risk levels measured from August 2014 to March 2015 were located, the slide described
24  the situation as one where "the site specific conditions drive the decision." *Id.*  On June
25  1, 2015, the Board of Governors of the Cajon Valley Union School District voted
26  unanimously to close Magnolia for the 2015-2016 school year because of the risk of
27  toxic vapor intrusion. *Id.* at 1.

28      Plaintiffs allege that the same chemicals that have been found under the

Magnolia site have also been found in the sub-surface soil and groundwater under Greenfield, Starlight, and Villa Cajon. *See id.* at 26–30. Plaintiffs also allege that the various chemicals found in the waste plume and by vapor monitoring have been found by federal agencies, including the Agency for Toxic Substances and Disease Registry ("ATSDR") and the Environmental Protection Agency ("EPA"), to have toxic health effects. *Id.* at 20. In particular, Plaintiffs allege that TCE and PCE are listed as having developmental, neurological, and carcinogenic effects on humans; vinyl chloride, which can be formed when other substances such as TCA, TCE, and PCE break down, has cardiovascular, developmental, hepatic, immunological, and carcinogenic effects; TCA has cardiovascular and neurological effects; DCE can cause liver, kidney, and developmental effects; and dioxane can have hepatic, ocular, renal, and carcinogenic effects. *Id.* at 20–22.

**PROCEDURAL BACKGROUND**

Plaintiffs are five limited partnership and limited liability companies that own Greenfield, Starlight, and Villa Cajon. *Id.* at 1. On July 10, 2015, Plaintiffs filed their initial complaint. ECF No. 1. On August 20, 2015, Plaintiffs filed an amended complaint. ECF No. 17.

Plaintiffs bring four causes of action for (1) negligence; (2) gross negligence; (3) public nuisance; (4) private nuisance; (5) trespass; (6) trespass (extrahazardous activity); and (7) strict liability (ultrahazardous activity). Compl. 31–36. Plaintiffs seek punitive as well as compensatory damages as to each cause of action. *Id.* at 31–36. Defendants filed separate motions to dismiss on September 8, 2015. ECF Nos. 23, 24. Plaintiffs responded on October 2, 2015. ECF Nos. 28, 29. Defendants replied on October 16, 2015. ECF Nos. 32, 33.

**LEGAL STANDARD**

A Rule 12(b)(6) dismissal may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121–22 (9th

Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555 (noting that on a motion to dismiss the court is"not bound to accept as true a legal conclusion couched as a factual allegation."). "The pleading standard . . . does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted). "Review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *See Metlzer Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

In analyzing a pleading, the Court sets conclusory factual allegations aside, accepts all non-conclusory factual allegations as true, and determines whether those nonconclusory factual allegations accepted as true state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 676–84; *Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (noting that "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal.") (internal quotation marks and citation omitted). And while "[t]he plausibility standard is not akin to a probability requirement," it does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). In determining plausibility,

1  the Court is permitted "to draw on its judicial experience and common sense." *Id.* at

2  679.

## DISCUSSION

### I.   Judicial Notice

"Although generally the scope of review on a motion to dismiss for failure to

state a claim is limited to the Complaint, a court may consider evidence on which

the complaint necessarily relies if: (1) the complaint refers to the document; (2) the

document is central to the plaintiff['s] claim; and (3) no party questions the

authenticity of the copy attached to the 12(b)(6) motion." *Daniels–Hall v. Nat'l

Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and

citations omitted). In addition, Fed.  R. Evid. 201(b) permits judicial notice of a fact

when it is "not subject to reasonable dispute because it: (1) is generally known

within the trial court's territorial jurisdiction; or (2) can be accurately and readily

determined from sources whose accuracy cannot reasonably be questioned." The

court may take notice of such facts on its own, and "must take judicial notice if a

party requests it and the court is supplied with the necessary information." Fed. R.

Evid. 201(c).

Under Rule 201, the court can take judicial notice of "[o]fficial acts of the

legislative, executive, and judicial departments of the United States," as well as the

"records and 'reports of administrative bodies.'" *Jackson v. Specialized Loan

Servicing, LLC*, 2014 WL 5514142, at *4 (C.D. Cal. Oct. 31, 2014) (citing

*United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943,

955 (9th Cir. 2008)). This includes documents in the public files of the Water Board

and DTSC. *See, e.g.*, *Tyco Thermal Controls LLC v. Rowe Indus., Inc.,* 2010 WL

4056007, at *1 (N.D. Cal. Oct. 15, 2010); *SPPI-Somersville, Inc. v. TRC

Companies, Inc.*, 2006 WL 1627010, at *4 n.1 (N.D. Cal. June 12, 2006).  Press

coverage and news articles are also judicially noticeable under Rule 201. *See

Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 976 (9th Cir. 1999)

Defendants seek judicial notice of a variety of items, which primarily consist of memorandums, correspondence, orders, and records of proceedings issued by the Water Board, DTSC, and other state agencies; authenticated correspondence between Defendants and said agencies; court documents; newspaper articles; and real property transaction records. *See generally* Am. Mot. Exs.; Sen. Mot. Exs. Plaintiffs argue that these items should not be considered because they constitute "extrinsic information or documents." Am. Opp. 2; Sen. Opp. 2. However, plaintiffs do not dispute the authenticity of these documents. The Court finds that these items are appropriate for judicial notice because they are matters of public record, the parties do not dispute their authenticity, and they are central to Plaintiff's claims. Therefore, the Court **GRANTS** Defendants' requests for judicial notice.

## II.    Ametek's Motion to Dismiss

Ametek argues that the case should be dismissed because: (1) Plaintiffs have failed to adequately plead facts supporting each of their causes of action; (2) the economic loss rule bars Plaintiffs' claims to recovery; (3) Plaintiffs lack standing; and (4) the statute of limitations bars Plaintiffs' claims. Ametek also argues that Plaintiffs are not entitled to punitive damages. Since some of Ametek's arguments overlap with each other, the Court will address Ametek's arguments grouped as appropriate.

### A.    Lack of compensable harm (all causes of action/standing)

Ametek makes a number of arguments that essentially boil down to the proposition that the case must be dismissed because Plaintiffs do not allege a compensable harm. In particular, Ametek argues that an allegation of redressable harm is necessary to: (1) each cause of action pled in the Complaint; (2) avoiding the application of the economic loss rule; and (3) standing. *See* Am. Mot. 10–15.

First, Ametek argues that Plaintiffs have not alleged compensable harm because Plaintiffs' only stated harm is groundwater contamination, and in California, landowners only have a usufructuary right to the groundwater

1  underlying their property, not a possessory ownership right. *Id.* at 11 (citing Cal.

2  Water Code § 102 ("All water within the State is the property of the people of the

3  State, but the right to the use of water may be acquired by appropriation in the

4  manner provided by law.")). Second, Ametek argues that the economic loss rule,

5  which bars recovery when the plaintiff has only suffered diminution in value

6  without physical harm to the property, thereby applies in this case. Am. Mot. 14–15

7  (citing *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 318

8  (2006). Third, Ametek argues that Article III standing requires redressable harm.

9  Am. Mot. 13–14 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

10  (noting that it is well-established that Article III standing requires (1) injury in fact;

11  (2) causality; and (3) redressability)). Plaintiffs respond that they allege not only

12  groundwater contamination, but also soil contamination and the emission of toxic

13  vapors. Am. Resp. 3–4.

14      Plaintiffs have the better of this argument. Throughout the Complaint,

15  Plaintiffs allege not only groundwater contamination, but also contamination of the

16  sub-surface soil. *See, e.g.*, Compl. 18, 26–27, 31–35. Plaintiffs allege that evidence

17  of such contamination was found by Ametek's own consultants. *Id.* at 27–28. In

18  addition, Plaintiffs allege that the waste plume is emitting toxic vapors in Magnolia

19  Elementary School, and that the same waste plume is underneath their land as well.

20  *Id.* at 13–15, 24. Several courts have found that these types of pollution constitute

21  compensable harms which can be redressed with recovery costs to abate and clean

22  up contaminated groundwater and soil. *See Newhall Land & Farming Co. v.*

23  *Superior Court*, 19 Cal. App. 4th 334, 341, 345 (1993) (finding viable claims for

24  nuisance and trespass where defendants had contaminated the soil and groundwater

25  on plaintiff's land); *see also Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125,

26

27

28

1   1133 (1991).[2] Accordingly, the Court finds that Plaintiffs have plausibly alleged

2   redressable harm based on groundwater and soil contamination.[3]

3   **B.     Other causes of action**

4   **i.     Gross Negligence**

5   Ametek argues that Plaintiffs have failed to adequately plead facts supporting

6   gross negligence. Am. Mot. 15. Gross negligence has long been defined as a either a

7   "want of even scant care" or "an extreme departure from the ordinary standard of

8   conduct." *City of Santa Barbara v. Superior Court,* 41 Cal. 4th 747, 754 (2007).

9   Ametek argues that Plaintiffs cannot show that Ametek failed to exercise

10  even scant care, since the Water Board's Executive Officer's Reports "routinely

---

12  [2]Ametek argues that *Newhall* should be limited to its facts, where the plaintiff used the polluted water for farming, was unable to sell the property due to the contamination, and had spent money investigating the pollution. Am. Reply 2. Here, Ametek argues, Plaintiffs have not alleged that they use the contaminated groundwater for any purpose, that they have attempted to sell the property, or that they have incurred costs investigating the pollution. *Id.*

15  However, *Newhall* cannot be so narrowly read. The facts adverted to by Ametek were only discussed in *Newhall* in the context of the Court of Appeal's finding that the plaintiff was specially injured for the purposes of his private nuisance claim. *See* 19 Cal. App. 4th at 342. The court found that Cal. Civ. Code § 3479 defined a nuisance much more generally: as "[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." *Id.* at 341  (alteration in original) (quoting *Venuto v. Owens-Corning Fiberglas Corp.*, 22 Cal.App.3d 116, 124 (1971)) (internal quotation marks omitted). Moreover, the court went on to find that the creation of a public nuisance qualified as tortious conduct for the purposes of the plaintiff's trespass claim. *See id.* at 345–47; *see also id.* at 345 (citing Restatement (Second) of Torts § 161(1) ("A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.")).

22  Finally, it is true that the Court of Appeal stated that they "want[ed] to emphasize that this opinion is limited to the facts alleged in the first amended complaint." *See id.* at 351; *see also* Am. Reply 2. However, the court then went on to describe those facts as follows: "our holding that petitioner has stated causes of action against Mobil and Amerada for nuisance, trespass and negligence is dependent on our regarding as true the allegations that Mobil and Amerada illegally discharged hazardous substances onto the ground knowing these substances would pollute the soil and enter the groundwater and then failed to disclose the existence of the contamination when the property was sold." *Id.* Nowhere does the court state that their holding is dependent upon whether the plaintiff specifically used the groundwater for a particular purpose, attempted to sell the property, or incurred any costs investigating the pollution.

28  [3] Because the Court so finds, the Court need not address Ametek's additional argument that Plaintiffs also cannot allege diminution in value or loss of use. Am. Mot. 12–13.

note" that "Ametek continues to conduct on-site and off-site soil vapor monitoring and groundwater monitoring in accordance with its cleanup and abatement order." Am. Mot. 16 (citing Ex. 39). Even assuming that is correct, however, as Plaintiffs point out, Am. Resp. 6, the Water Board also filed an Administrative Liability Complaint in 2008 criticizing Defendants for "hav[ing] not installed a sufficient monitoring well network to delineate the vertical and horizontal extent of the waste plume and hav[ing] not taken any efforts to cleanup and abate the effects of their discharge" despite "20 years of investigation efforts," and stating that Defendants "were repeatedly advised that their submittals regarding plume delineation were incomplete or deficient, yet they failed to conduct additional work to address the deficiencies," Compl. 9. Plaintiffs allege that over the course of over two decades, Ametek "dump[ed] 1.848 million gallons of toxic waste next to nearby properties and an elementary school," and then "fail[ed] to clean up or abate the toxic plume it created, knowing it flowed beneath those properties." Am. Resp. 6–7. Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have plausibly stated a claim for gross negligence.

### ii. Trespass (extrahazardous activity)/Strict Liability (ultrahazardous activity)

Ametek argues that Plaintiffs have failed to adequately plead facts supporting a claim for strict liability based on "ultrahazardous" activity (alternatively termed "extrahazardous" activity, *see Abnormally Dangerous Activity, Black's Law Dictionary* (9th ed. 2011)). Am. Mot. 16–17. A six-part test is used to determine whether a particular activity is ultrahazardous and thus subject to strict liability:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*In re Burbank Envtl. Litig.*, 42 F. Supp. 2d 976, 983 (C.D. Cal. 1998) (citing

Restatement (Second) of Torts § 520 and cases). A number of courts have determined that under this test, the act of using solvents such as TCE and PCE to clean metal parts in an industrial site is not an ultrahazardous activity, because the risks associated with the use, storage, and/or disposal of such industrial solvents can be avoided through the exercise of reasonable car. *Id.* (citing *Schwartzman, Inc. v. General Elec. Co.*, 848 F. Supp. 942, 945 (D.N.M. 1993); *Greene v. Product Mfg. Corp.*, 842 F. Supp. 1321, 1326–27 (D. Kan. 1993); *see also Palmisano v. Olin Corp.*, No. C-03-01607 RMW, 2005 WL 6777560, at *17 (N.D. Cal. June 24, 2005). Plaintiffs cite no cases supporting the proposition that the use, storage and/or disposal of such solvents is considered an ultrahazardous activity. Accordingly, Plaintiffs' trespass (extrahazardous activity) and strict liability (ultrahazardous activity) claims are **DISMISSED**.

### C. Statute of Limitations

Ametek argues that Plaintiffs cannot satisfy the three-year statute of limitations for trespass, negligence, or injury to real property in California under Cal. Civ. Proc. Code § 338(b). Ametek argues that the cause of action accrued more than three years ago since the statute of limitations began to run at the very latest when the contamination ceased with the sump's removal in 1988. Am. Mot. 20. Plaintiffs respond that even if this is so, they satisfy the requirements for the "delayed discovery" rule specified in the latter part of § 340.8(a). Am. Resp. 12. Plaintiffs argue that they did not have notice of the waste plume until either May 7, 2015, when DTSC held the community meeting where the recent air quality test results were disclosed, or June 1, 2015, when the Board of Governors decided to shut down Magnolia Elementary School. *Id.* at 13.

Ametek argues that even if Plaintiffs did not have actual notice until May 2015, Plaintiffs are charged with inquiry notice of the waste plume under the delayed discovery rule. *See* Am. Mot. 21. Ametek relies on *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1114 (1988) and *Camsi IV v. Hunter Tech. Corp.*, 230 Cal. App.

3d 1525, 1530 (1991), to support the proposition that the limitations period begins when a plaintiff is put on inquiry notice of wrongdoing. *Eli Lilly*, 44 Cal. 3d at 1114. Under this line of reasoning, Plaintiffs should have been aware of the health risk posed by the waste plume decades prior, since the Water Board issued a publicly available Administrative Liability Complaint against Ametek in 2008, the Water Board and DTSC issued a series of reports between 1998 and 2008, the Ametek facility and the cleanup and abatement operations were open and notorious operations which have been subject to "countless public meetings, hearings, and notices," including notices to community members, and many news articles have been written about the ongoing controversy. Am. Mot. 22–23.

However, Ametek's reliance on these cases to support their argument that Plaintiffs should have been on inquiry notice is misplaced. In *Eli Lilly*, the Supreme Court of California extensively discussed the standard of notice applicable under the delayed discovery rule. The Court found that under the delayed discovery rule, the statute of limitations only begins to run once the plaintiff has a "suspicion of wrongdoing," that is, "that someone has done something wrong to her." 44 Cal. 3d at 1110. The Court then found that the one-year statute of limitations barred plaintiff's claim, since plaintiff testified that well over a year before she filed suit, she had wanted to "'make a claim' [because] she felt that someone had done something wrong to her concerning [the drug at issue], that it was a defective drug and that she should be compensated." *Id.* at 1112.

In other words, as the Court of Appeal later put it in *Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1251 (2013):

> [A] two-part analysis is used to assess when a claim has accrued under the discovery rule. The initial step focuses on *whether the plaintiff possessed information that would cause a reasonable person to inquire into the cause of his injuries*. Under California law, this inquiry duty arises when the plaintiff becomes aware of facts that would cause a reasonably prudent person to suspect his injuries were the result of wrongdoing. If the plaintiff was in possession of such facts, thereby triggering his duty to investigate, it must next be determined whether "such an investigation would have disclosed a factual basis for a cause of action[.] [T]he statute of limitations begins to run on that cause of

action when the investigation would have brought such information to light."

*Id.* (second and third alterations in original) (citations omitted).

The cases the Court discussed in *Eli Lilly* bear out this point. First, in *Miller v. Bechtel Corp.*, 33 Cal. 3d 868 (1983), the Court held that a plaintiff was barred by the statute of limitations from pursuing her suit for fraud when plaintiff had long-held suspicions that her former husband had concealed the true worth of his assets during dissolution negotiations, but where "neither she nor her attorney took adequate steps then to investigate the matter." 44 Cal. 3d at 1111. The Court held that "her early suspicion put her on inquiry notice of the potential wrongdoing." *Id.* Second, in *Gray v. Reeves*, 76 Cal. App. 3d 567 (1978), the Court of Appeal held that a plaintiff was barred by the statute of limitations where the plaintiff had suffered an allergic reaction to a drug in 1971, but delayed filing suit against the prescribing doctor and manufacturer until 1973. 44 Cal. 3d at 1111 "The Court of Appeal noted plaintiff's admission that in 1971 he knew defendants 'did something wrong'" in finding that "[e]ven without specific facts as to why the drug was defective, plaintiff was on notice at that time that he had a potential cause of action." *Id.* (citations omitted).

The other case Ametek cites is similarly unavailing. In *Camsi IV*, the Court of Appeal found that a company that purchased a parcel of land from defendants could not meet the three-year statute of limitations for their toxic tort suit where their actions in only selling "uncontaminated" portions of their property more than three years before filing suit demonstrated their awareness that some of the land was contaminated. *Camsi IV v. Hunter Tech. Corp.*, 230 Cal. App. 3d 1525, 1537 (1991), *reh'g denied and opinion modified* (July 2, 1991).

Thus, under California's approach to the delayed discovery rule, it is only once a plaintiff possesses information that would cause a reasonable person to inquire into the cause of their injuries that they are under an obligation to investigate the pertinent facts and the statute of limitations begins to run. Here,

Plaintiffs allege that they had no awareness of the risk posed by the waste plume until May 7, 2015 at the earliest, and they filed suit just over two months later on July 10, 2015. Plaintiffs are entitled to avail themselves of the delayed discovery rule.[4]

### D.    Punitive Damages

Ametek argues that Plaintiffs are not entitled to punitive damages. Am. Mot. 33. Under Cal. Civ. Code. § 3294(a)), punitive damages require proof by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. § 3294(c) in turn provides:

> (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
> (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.
> (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

Conclusory assertions that a defendant has so acted are not enough: sufficient facts must be alleged to support a request for punitive damages. *Smith v. Superior Court*, 10 Cal. App. 4th 1033, 1042 (1992). Ametek asserts that "[t]here is not a single allegation in the FAC capable of supporting punitive damages." Am. Mot. 25. But as Plaintiffs point out, the Complaint alleges that "Ametek intentionally dumped 1.848 million gallons of toxic waste into a hole in the ground immediately adjacent to an elementary school and residential area" and then "consciously and willfully ignored the state's Cleanup and Abatement Order by not collecting samples to delineate the nature and extent of the toxic plume." Am. Resp. 14–15. In *Smith*, the Court of Appeal ordered plaintiff's prayer for punitive damages struck where the plaintiff's amended complaint alleging defendants failed to represent her property

---

[4] Since the Court so rules, the Court need not address Plaintiffs' additional argument that the statute of limitations does not apply because the waste plume constitutes a continuing nuisance. *See* Am. Resp. 11.

interests in a dissolution proceeding contained no factual assertions supporting a conclusion petitioners acted with oppression, fraud or malice. By contrast, here, Plaintiffs have pled facts that plausibly support their argument that Defendants acted with "willful and conscious disregard of the rights and safety of others." Accordingly, the Court declines to bar Plaintiffs' request for punitive damages at this stage of the litigation.

### III.   Senior Operations' Motion to Dismiss

Senior Operations argues that the case should be dismissed because: (1) the statute of limitation bars Plaintiffs' claims; and (2) Plaintiffs fail to state any claim against Senior. The Court will address each argument in turn.

//

### A.   Statute of Limitations

First, Senior argues that the statute of limitation bars Plaintiffs' claims because they had reason to suspect the presence of the toxic waste plume due to the "hundreds of publicly available regulatory notices and reports, open meetings of the [Water Board], newspaper articles, television station reports, litigation filings, and continuous air vapor, soil and water testing openly and notoriously conducted in the vicinity of the Ametek [facility], including within the Starlight Mobile Home Park." Sen. Mot. 7.

However, as discussed above in Part II.C, under California's approach to the delayed discovery rule, it is only once a plaintiff possesses information that would cause a reasonable person to inquire into the cause of their injuries that they are under an obligation to investigate the pertinent facts and the statute of limitations begins to run. Here, Plaintiffs allege that they had no awareness of the risk posed by the waste plume until May 7, 2015, and they filed suit just over two months later on July 10, 2015. Even if the Court considers the voluminous filings provided by Defendants, they do not support the proposition that a reasonable owner would have been aware of the risk posed by the waste plume. Defendants' filings include

numerous previous representations by DTSC and the Cajon Valley School District that the toxic vapor levels emitted at neighboring Magnolia Elementary School "d[id] not pose a significant risk" to human health. Am. Mot., Ex. 40; Sen. Mot., Ex. LL. Thus, even if Plaintiffs had been aware of the testing conducted around the school and Starlight and these communications, they reasonably could have believed until the May 7, 2015 meeting that the waste plume did not yet pose a risk to human health. Accordingly, under the facts alleged, Plaintiffs are entitled to avail themselves of the delayed discovery rule.[5]

### B.   Claims against Senior

Senior argues that the case should be dismissed as to Senior because Plaintiffs fail to state any claim against Senior. Sen. Mot. 13. Specifically, they argue that: (1) Plaintiffs do not ascribe any wrongful conduct to Senior; (2) Plaintiffs' nuisance claims are precluded by Cal. Civ. Code § 3482; (3) Plaintiffs fail to plead the essential elements for the negligence and gross negligence claims; (4) Plaintiffs fail to plead the essential elements for a public nuisance claim; (5) Plaintiffs fail to plead the essential elements for a trespass claim; and (6) Plaintiffs fail to allege facts supporting an award of punitive damages against Senior.[6] The Court will address each argument in turn.

### i.   Wrongful conduct on the part of Senior

First, Senior argues that Plaintiffs have not specified Senior's wrongful conduct as distinct from Ametek's. Sen. Mot. 13. However, the Complaint alleges

---

[5] Since the Court did not address Plaintiffs' additional argument that the statute of limitations does not apply because the waste plume constitutes a continuing nuisance, *see* Part II.C fn. 3, the Court also need not address Senior's countering argument that the waste plume should be understood as a permanent nuisance. *See* Sen. Mot. 12–13.

[6] Senior's other arguments have already been addressed in this Order. Senior's argument that Plaintiffs fail to identify any actionable harm, Sen. Mot. 17–19, is addressed by Part II.A of this Order rejecting Ametek's argument that Plaintiffs do not allege redressable harm. Senior's arguments that Plaintiffs fail to plead the essential elements for private nuisance, trespass (extrahazardous activity), and strict liability claims, Sen. Mot. 21–24, are addressed by Parts II.A and II.B.ii of this Order.

that "[Senior Operations] knows or has known that pure TCE and other chemicals beneath its property ha[ve] been and continue[] to be a constant source and supply of toxic chemicals, which continue to contaminate the groundwater as it passes through the property's subsurface soils" and "into and beneath the Plaintiffs' properties," "and despite this knowledge, [Senior] has consciously ignored the risk of further contamination and has chosen not to clean up or remediate the pure TCE and other chemicals." Compl. 30–31. These allegations are enough to put Senior on "sufficient notice of the allegations against them." *See Arikat v. JP Morgan Chase & Co.*, 430 F. Supp. 2d 1013, 1020 (N.D. Cal. 2006) (quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)) (internal quotation mark omitted).

Second, Senior argues that Plaintiffs have not alleged that Senior in any way "create[d] or exacerbate[d]" the contamination. Sen. Mot. 14. Senior relies on *Resolution Trust Corp. V. Rossmore Corp.*, 34 Cal. App. 4th 93, 99–100 (1995) for the proposition that an "owner of contaminated land is liable for trespass only if it was an active, intentional participant in causing the contamination." Sen. Mot. 13. However, Senior's reliance on *Rossmoore* is misplaced. *Rossmore* found that a defendant lessor was not liable for nuisance or continuing trespass where there was a fuel leak and resulting contamination on a property where the lessor did not have control over the occupation or operation of the premises, but did have a right to reentry, the lessor was not initially aware of the dangerous condition, the lessor acted with ordinary care once they learned of the leaks since they promptly remedied the leaks, and there was no evidence that any failure to act on the part of the lessor caused plaintiff's injury following the occurrence of the leaks. *Rossmore* is inapplicable since here, Plaintiffs have not alleged that Senior is a lessor, but that Senior owned the Ametek facility and had control over it from 1998 onwards. Moreover, unlike in *Rossmore*, here, Plaintiffs allege that Senior was aware of the dangerous condition, and that they did not act with ordinary care once they were

aware of the dangerous condition, but instead did nothing to remedy it.

Finally, Senior argues that regulatory documents impose a duty on "Ametek alone" to redress contamination issues, not Senior. Sen. Mot. 14 But Senior cites no authority for the proposition that a regulatory imposition of a duty to remediate on one defendant mitigates another defendant's duties under common law.

### ii.    Cal. Civ. Code § 3482

Senior argues that Plaintiffs' nuisance claims are precluded by Cal. Civ. Code § 3482, which provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." Sen. Mot. 15. Senior argues that under the Prospective Purchaser Agreement ("PPA") Senior secured from the Water Board, the Water Board "affirm[ed] that this mutual release and covenant not to sue resolves Senior's liability to the Regional Board with regard to any claims related to the matters include in the Prospective Purchaser Agreement and the Resolution" pursuant to § 113(f)(2) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), which provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed to the settlement." Sen. Mot. 15, Ex. F.

As Plaintiffs correctly point out, the PPA by its own terms only released Senior's liability with respect to the Water Board. But even if it did not, the PPA is not a "statute" under the terms of § 3482. As the California Supreme Court observed in *Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal. 3d 86, 100–01 (1979),

> We have consistently applied a narrow construction to section 3482 and to the principle therein embodied. Thus, a number of years ago we observed, "A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury."

1  The PPA, a settlement agreement promulgated by a state agency, cannot be

2  understood as a "statute" under this stringent standard.

3       Senior also argues that "[f]ederal and state law also provide limited immunity

4  from liability for bona fide purchasers like Senior that did not directly cause or

5  contribute to the release of hazardous substances." Sen. Mot. 16–17 (citing

6  CERCLA, 42 U.S.C. § 9607(r) and the California Land Reuse and Revitalization

7  Act (CLRRA) of 2004, Cal. Health & Safety Code § 25395.81). However, neither

8  statute is applicable. Even assuming that Senior is a bona fide purchaser, 42 U.S.C.

9  § 9607 provides immunity only from *CERCLA* liability for bona fide purchasers.

10  And § 25395.81 provides immunity for bona fide purchasers only where a release of

11  hazardous materials was characterized, or a response plan was approved pursuant

12  to, Article 6 of the same statute. § 25395.81(1). Senior does not, and could not

13  allege that the PPA was approved pursuant to Article 6 of the same statute, since the

14  CLRRA was only passed in 2004 and the PPA was promulgated in 1998.

15            **iii.**    **Negligence and gross negligence**

16       Senior argues that Plaintiffs have not pled the requisite elements for a claim

17  of negligence or gross negligence because they have not alleged facts demonstrating

18  "a duty, breach of that duty, causation, and damages." Sen. Mot. 19–20. In a toxic

19  tort case, a duty to exercise reasonable care may exist where a defendant has

20  subjected a plaintiff to harm by exposing their land to toxic chemicals. *See Walnut*

21  *Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d 918, 934 (N.D. Cal.

22  2009) (noting that "[n]o person is permitted by law to use his property in such a

23  manner that damage to his neighbor is a foreseeable result" (quoting *Booska v.*

24  *Patel*, 24 Cal.App. 4th 1786, 1791 (1994)), and finding that defendant had a duty to

25  not act in a way that would potentially release PCE onto plaintiff's property). The

26  Court finds that, viewing the Complaint in the light most favorable to Plaintiffs,

27  Plaintiffs have alleged facts sufficient to state a plausible claim that Senior

28  Operations had a duty to exercise reasonable care, that Senior breached that duty by

1   "consciously ignor[ing]" the risk of contamination the toxic waste plume posed to

2   Plaintiffs, and that such a breach caused the groundwater and soil contamination on

3   Plaintiffs' land.

4             **iv.**   **Public Nuisance**

5       Senior argues that Plaintiffs have failed to adequately plead facts supporting a

6   private claim for public nuisance because they have not demonstrated that they

7   suffer a harm that is unique to them as opposed to the general public. Sen. Mot. 20.

8   The general rule is that public nuisance actions must be brought by government

9   officials. *Cty. of Santa Clara v. Superior Court*, 50 Cal. 4th 35, 55 (2010) (citing

10   Cal. Civ. Code §§ 3493–3494). However, a private party may bring a public

11   nuisance action where the nuisance is "specially injurious" to the private party,

12   beyond the harm caused by the nuisance to the general public. *Birke v. Oakwood*

13   *Worldwide*, 169 Cal. App. 4th 1540, 1548 (2009) (citing Cal. Civ. Code § 3493).

14   This exception has its origins in the common law, which recognized that "'the

15   action would lie if the plaintiff could show that he had suffered special damage over

16   and above the ordinary damage caused to the public at large by the nuisance."

17   *Venuto v. Owens-Corning Fiberglass Corp.*, 22 Cal. App. 3d 116, 123–24 (1971)

18   (quoting Prosser on Torts 608 (3d ed.)).

19       Plaintiffs argue that they have been specially injured because "their property,

20   including their groundwater and soil, has been contaminated by the plume." Sen.

21   Resp. 16. Senior relies on *Venuto* to argue that in order to show special injury,

22   Plaintiffs must allege facts showing injury to themselves "different *in kind* from that

23   suffered by the general public," rather than just in degree. *Venuto*, 22 Cal. App. 3d

24   at 124 (citing cases); *see also* Am. Mot. 21. In *Venuto*, the Court of Appeal rejected

25   a public nuisance claim where plaintiffs alleged that air pollution from a fiberglass

26   manufacturing plant aggravated their allergies and respiratory disorders where

27   "such allegations merely indicate[d] that plaintiffs and the members of the public

28   are suffering from the same kind of ailments but that plaintiffs are suffering from

them to a greater degree." 22 Cal. App. 3d. at 125.

Other courts have disagreed about the viability of *Venuto*'s approach. In *Birke v. Oakwood Worldwide*, the Court of Appeal suggested that *Venuto* might be an "incorrect statement of the law" while reversing the trial court's dismissal of a public nuisance claim where the plaintiff alleged that a residential apartment complex owner's failure to limit secondhand smoke in outdoor common areas aggravated her allergies and asthmatic symptoms. 169 Cal. App. 4th at 1550 (quoting *Lind v. City of San Luis Obispo*, 109 Cal. 340, 344 (1895) ("[A]n injury to private property, or to the health and comfort of an individual, is in its nature special and peculiar and does not cause a damage which can properly be said to be common or public, however numerous may be the cases of similar damage arising from the same cause." (alteration in original)); Restatement (Second) of Torts § 821C com. d. (1979) ("When the public nuisance causes personal injury to the plaintiff or physical harm to his land or chattels, the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained.")). *But see Guttman v. Nissin Foods (U.S.A.) Company, Inc.*, No. C 15-00567 WHA, 2015 WL 4309427, at *5 (N.D. Cal. July 15, 2015) (suggesting that *Birke* should be limited to its facts, since "the injury contemplated in that decision was the aggravation of the plaintiff's asthma due to the alleged nuisance of second-hand smoke, which was a special injury as compared to the general public's increased risk of lung cancer"). And in *Lind*, the California Supreme Court permitted a private suit for public nuisance to go forward where a defendant sewage company had built a storage vault 300 feet from plaintiff's house. 109 Cal. 340 at 342. While the stench was noticeable to those living further away, it was particularly "intolerable" for plaintiff and one or two of his neighbors that lived closest to the sewage vault. *Id.* The Court found that the stench constituted a "special injury" to the rights of the plaintiff which was "not common to the public generally." *Id.* at 438.

After consideration of the applicable law, the Court finds that Plaintiffs have

not alleged a plausible case for public nuisance. Plaintiffs' claim that they have been specially injured by the contamination since their groundwater and soil has been contaminated by the waste plume is a harm too similar to that suffered by the general public, since such a claim would be available to anyone whose property was above the 1.3 mile waste plume Plaintiffs are alleging. Accordingly, the Court **DISMISSES** Plaintiff's public nuisance claim as to all Defendants.

### v.   Trespass

Senior argues that Plaintiffs cannot assert a claim for trespass because as landlords, they do not have a possessory interest in the land at issue and thus cannot bring a trespass claim. Sen. Mot. 22 (citing *Dieterick Int'l Truch Sales v. J.S. & J. Servs., Inc.*, 3 Cal. App. 4th 1601, 1609 (1992)). Senior's reliance on *Dieterick* is misplaced. *Dieterick* found that because a landlord had no present possessory interest in property let to a tenant for the purposes of preventing that tenant from obtaining a prescriptive easement, a prescriptive easement could not ripen against him. *Id.* at 1610. However, an out-of-possession property owner may recover for an injury to the land by a trespasser which damages the ownership interest. *See id.* (citing *Smith v. Cap Concrete, Inc.*, 133 Cal. App. 3d 769, 774 (1982)); *see also Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1192 (C.D. Cal. 2011). As the Court of Appeal explained in *Smith*,

> The inquiry in a case involving unlawful intrusion on property rights should focus upon the nature of the injury and the damages sought: If the right to possession has been abridged and possessory rights damaged, the possessor may complain by way of an action for trespass; if, on the other hand, an intruder harms real property in a manner which damages the ownership interest, the property owner may seek recovery whether the cause of action be technically labeled trespass or some other form of action, such as waste.

133 Cal. App. 3d at 775. The *Smith* court permitted the plaintiff landlords to bring an action against a third-party concrete company for depositing "broken concrete wash-out" on their property at the behest of the tenants' sublessee. *Id.* at 773 (internal quotation marks omitted). Under this standard, Plaintiffs have plausibly pled trespass.

### vii.   Punitive damages

Senior argues that Plaintiffs have failed to allege facts supporting an award of punitive damages against Senior. Sen. Mot. 24. Senior argues that their actions in "defer[ring] to Ametek's cleanup effort" cannot meet the oppression, fraud, or malice standard for punitive damages. *Id.* at 25. However, as discussed above in Parts II.D and III.B.i, Plaintiffs have plausibly alleged that Senior acted with a "willful and conscious disregard of the rights or safety of others" in "consciously ignor[ing]" the danger posed by the toxic waste plume to Plaintiffs. Accordingly, the Court declines to bar Plaintiffs' request for punitive damages at this stage of the litigation.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.   Ametek's Motion to Dismiss (ECF No. 25) is **GRANTED IN PART** and **DENIED IN PART**.

2.   Senior Operations' Motion to Dismiss (ECF No. 24) is **GRANTED IN PART** and **DENIED IN PART**.

3.   Plaintiffs' trespass (extrahazardous activity), strict liability (ultrahazardous activity), and public nuisance claims are **DISMISSED** as to all Defendants.

DATED:  November 18, 2015

HON. GONZALO P. CURIEL
United States District Judge