UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

GREENFIELD MHP ASSOCIATES, L.P., et al.,

Plaintiffs,

v.

AMETEK, INC., a Delaware corporation; SENIOR OPERATIONS, LLC, a limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No.: 3:15-cv-01525-GPC-AGS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 135]**

Before the Court is Defendant Ametek, Inc.'s motion for summary judgment. (ECF No. 135.) The motion is fully briefed. For the reasons set forth below, the Court GRANTS the motion in part, to the extent that Ametek argues that Plaintiffs cannot obtain compensatory damages based on future remediation costs under the circumstances of this case. This case will move forward, however, with the understanding that if Plaintiffs prevail at trial in establishing Ametek's liability, the Court will fashion the appropriate remedy.

## I. Background

In this case, owners of three mobile home parks—Greenfield, Villa Cajon, and

Starlight—sue Ametek, Inc., and Senior Operations, LLC, over contamination of Plaintiffs' property resulting from a release of toxic chemicals at a neighboring manufacturing facility. The parties have offered the following relevant evidence into the summary judgment record.

Prior to 1968, Straza Industries owned an aerospace parts manufacturing facility (the "Facility") at 790 Greenfield Drive in El Cajon, California. During that time Straza constructed a redwood-lined, subsurface storage sump tank (the "pit") at the Facility to collect and store solvents and other chemicals. (ECF No. 135-16 at 2418–19.[1]) Straza did not construct anything at the bottom of the pit; rather, the pit "was placed on hardpan soil comprised of rock and decomposed granite." (ECF No. 155-23 at 581.)

Ametek purchased Straza—and the Facility—in 1968 and continued to operate the Facility until 1988. (ECF No. 135-5 at 269.) During that time, Ametek collected waste paint, paint thinners, epoxies, and solvents in the pit. (ECF No. 135-16 at 2393.) This waste contained chemicals including, but not limited to, 1,1,1-Trichloroethane (1,1,1-TCA), Tetrachloroethene (PCE), and Trichloroethylene (TCE), all of which are volatile organic compounds. (ECF No. 155-18 at 385.) In 1983, Ametek closed the sump. (ECF No. 135-6 at 389.)

Plaintiffs' properties are located west and downgradient of the Facility. Starlight is adjacent to a portion of the Facility's western border, and Villa Cajon adjoins most of Starlight's western border. Also adjoining the Facility's western border, and south of Starlight, is Magnolia Elementary School ("MES"). Greenfield adjoins the western border of MES and the southern borders of Starlight and Villa Cajon. A map showing the location of these properties can be found at ECF No. 155-35 at 1121.

At some point prior to Ametek's closing the pit, the waste breached the pit and leaked into the surrounding ground. (ECF No. 155-5 at 38; ECF No. 155-13 at 253; ECF

---

[1] The page numbers cited throughout this ruling refer to the Bates Stamp numbers included on both parties' exhibits.

No. 155-14 at 275.)  By 2003, more than 500,000 gallons of liquid waste had been discharged into the surrounding soil and water.  (ECF No. 155-15 at 301.)  This contamination produced a plume traveling downgradient (*i.e.*, following the direction of the groundwater flow, ECF No. 155-5 at 97), extending beyond the Facility boundaries and into the soil and groundwater under MES, Greenfield, Starlight, and Villa Cajon.  (ECF No. 155-17 at 343–44; ECF No. 155-18 at 387; ECF No. 155-36 at 1147–48.)  One of the major risks created by the plume is "vapor intrusion," which poses health risks so severe that the school district governing MES closed MES for a year.  (ECF No. 155-18 at 388–89; ECF No. 155-18 at 408.)  Testing in 2017 performed inside structures on Plaintiffs' properties indicated several instances of "above-benchmark" level of cancer risks.  (ECF No. 155-37 at 1176–77.)  According to Plaintiffs' expert Anthony Brown, if the plume is left unremediated, it could persist beneath Plaintiffs' properties for 185 years.  (ECF No. 155-24 at 632–33.)

In 1986, Ametek hired environmental consultant ERM to complete an environmental investigation into the sump.  (ECF No. 155-6 at 109.)  Early sampling of the surrounding area indicated that the groundwater contained up to 62,000 parts per billion TCE.  (ECF No. 155-16 at 314.)  In 1988, Ametek—in consultation with the San Diego County Department of Environmental Health—excavated the sump and 150 cubic yards of surrounding soil.  (ECF No. 135-6 at 318–21; ECF No. 135-6 at 415.)  It was observed around that time that "groundwater was draining into the disposal pit through a fracture within the bedrock" that formed the bottom of the pit.  (ECF No. 155-23 at 582.)  The same year, Ametek spun off a new company named Ketema, which acquired several Ametek assets including the Facility.  (ECF No. 135-14 at 2035.)

In 1998, with the approval of the California Regional Water Quality Control Board[2] (the "RWQCB") Senior Flexonics, Inc. acquired the Facility.  (ECF No. 135-16 at

---

[2] "California's Regional and State Water Boards are the principal state agencies with primary responsibility for the coordination and control of water quality.  Among other things, the Boards'

3:15-cv-01525-GPC-AGS

2379–90.)  At the same time, the RWQCB issued a Cleanup and Abatement Order (the "1998 CAO") naming Ametek and Ketema as the "responsible parties" of the contamination plume.  (ECF No. 135-5 at 203–07.)  The 1998 CAO ordered Ametek and Ketema to submit, *inter alia*, a final groundwater site assessment, a feasibility study, a groundwater management plan, and a remedial action plan ("RAP").  (*Id.* at 204–05.)  Finding Ametek and Ketema's[3] submissions inadequate and unsatisfactory, the RWQCB issued another CAO in 2002 (the "2002 CAO").  (ECF No. 155-13 at 268–72.)  At the same time, Ametek also engaged in mediation with the RWQCB.  (ECF No. 155-18 at 467.)  In 2004, the RWQCB issued notices of violation against Ametek and Ketema asserting that the two companies failed to adhere to their obligations under the RWQCB's orders.  (ECF No. 155-19 at 471–505.)  In 2008, the RWQCB filed an Administrative Civil Liability Complaint against Ametek.[4]  (ECF No. 155-20 at 507–08.)  The following year, the RWQCB and Ametek reached a settlement in which Ametek agreed to pay a total of $1,095,000.00 for its violations of the 2002 CAO.  (ECF No. 155-21 at 548.)  According to the agreement, Ametek would pay $600,000 immediately, but could satisfy the remaining portion of its obligation by adhering to a new Cleanup Abatement Order (the "2009 CAO")—which named Ametek as the only responsible party—and implementing a RAP.  (*Id.*)

In 2012, Ametek began remedial activities by constructing pump-and-treat ("P&T") systems "utilizing existing groundwater monitoring wells as extraction wells along the western property line separating the Ametek Facility from MES and []

---

policies and procedures govern the investigation, oversight, and remediation of contaminated water for public use."  *People of Cal. v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1081 (S.D. Cal. 2008) (*Kinder I*) (citation omitted).

[3] By this time, Ketema had been renamed Schutte & Koerting.  For simplicity, the Court refers to this entity as Ketema.

[4] Ketema filed for bankruptcy in 2007.  (ECF No. 139-1 at 2594–96.)

Starlight." (ECF No. 155-24 at 610.) Ametek expanded the P&T system in 2015 "to include extraction wells on the MES property along the western and northern property lines separating MES from" Greenfield at Starlight, respectively. (*Id.*) The P&T system is intended to address the "core-strength" of the plume. (*Id.*) In 2015, Ametek conducted an in-situ chemical oxidation ("ISCO") remediation test by injecting a potassium permanganate solution into the groundwater at monitoring well locations at the Facility. (*Id.*) An expansion of the ISCO system to other areas of the Facility to address the core-strength of the plume is currently in progress. (*Id.*) There has been no remediation action taken to address groundwater contamination that is less than 1,000 ug/L TCE, which is roughly 200 times greater than the 5 ppb maximum contaminant level for drinking water set by the RWQCB. (*Id.* at 611, 638.)

The RWQCB confirmed in a letter to Ametek in May 2017 that Ametek had completed its RAP implementation obligations under the settlement. (ECF No. 155-36 at 1132.) The RWQCB therefore waived the remainder of Ametek's financial liability under the settlement agreement. (*Id.*) In that letter, the RWQCB stated that it was "transferring lead regulatory oversight of this project to the Department of Toxic Substances Control (DTSC),"[5] but that "Ametek is still required to comply with all directives" set forth in the 2009 CAO. (*Id.*) According to Brown, groundwater remediation between 2012 and 2016 using a P&T system has removed between 3.4% and 6.7% of the total contaminant mass of the plume. (ECF No. 155-23 at 603.)

As described in his expert report, Brown prepared a feasibility study "to evaluate various remedial alternatives to address groundwater contamination beneath the MHPs [mobile home parks]." (ECF No. 155-24 at 622.) He concluded that P&T "with

---

[5] "DTSC is the state agency responsible for ensuring that California's public health and environment are protected from the harmful effects of hazardous substances. DTSC is authorized to oversee the cleanup of hazardous waste sites by issuing remedial orders and by entering into agreements with 'potentially responsible parties' . . . to facilitate remediation." *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 934 (9th Cir. 2002).

treatment using GAC [granular activated carbon] for chlorinated VOCs and AOP [advanced oxidation process] for 1,4-dioxane" was the preferred remedial approach. (*Id.*) Brown proposes P&T systems for each park property "to allow the MHP owners to control the remediation at their property." (*Id.*) Under this approach, "active groundwater pumping would proceed for between 11.7 and 13.6 years . . . followed by five years of post-remediation monitoring and three years of post-closure monitoring." (*Id.*) In all, according to Brown, full remediation under this approach could occur in approximately 20 years. Under an approach using separate P&T systems at each property, full remediation at Greenfield would cost $8,464,264; at Villa Cajon $7,441,965; and at Starlight $7,934,907—a total of $23,841,136. (*Id.* at 623, 637.) If the parks implemented a collective remedy, however, the total cost could be approximately five to six million dollars cheaper. (ECF No. 155-17 at 382.)

Plaintiffs assert that Ametek's current remediation plan "does not include any remediation activities on Plaintiffs' MHP properties" or address the contamination of Plaintiff's properties. They also assert that Ametek has "never proposed remediation measures on Plaintiff's [MHP] properties." (ECF No. 155-1 at 110.) The relevant evidence in the record Plaintiffs cite for these propositions consists of the following. Hydrogeology expert Thomas Johnson testified at his deposition that he was not aware of any plans to implement remediation measures on Plaintiffs' properties. (ECF No. 155-5 at 85, 90, 91.) Expert Eric Nichols testified, in response to a question asking whether the system in place at MES was the only remedial action contemplated for Plaintiffs' properties, that there was also "language in various planning documents by ERM to leave open the option of expanding that current IRM," that "it's very customary in the remediation business to . . . establish a priority area to remediate . . . and then expand outward from there," and that the RWQCB was in the middle of "that process." (ECF No. 155-36 at 1136.) Dana Sam Williams—an expert retained by Senior (ECF No. 172 at 11 n.9)—testified that he was not aware of any pump-and-treat systems to be put in place on Plaintiffs' properties, but that he thought it was "unlikely that wells won't be

placed on the [MHP] properties," and that he "expect[ed] wells will be placed on the [MHP] properties as a requirement to DTSC to clean up the plume." (ECF No. 155-36 at 144–48.) Finally, Brown states in his report that "to date, no plans for the implementation of any groundwater remediation has been proposed for areas down-gradient of the MES" or "to address: (1) the existing 'core-strength' on contamination beneath the MHPs and beyond the hydraulic capture of the groundwater P&T system, and (2) groundwater contamination present at concentrations less than the 'core-strength' of the contaminated groundwater, that is, less than 1,000 ug/L." (ECF No. 155-24 at 613–14, 631–37, 1121, 1125–30.) According to Brown, if no additional remedial measures are taken beyond what is in place, Plaintiffs' properties will be contaminated with TCE for at least another 50 years. (*Id.* at 634–36.)

Plaintiffs also assert that new contamination from the Facility continues, to this day, to flow into the groundwater under their property. They cite the following relevant evidence. The 1998 CAO states that Ametek caused "chlorinated solvents to be deposited" into the Facility ground and that the lack of remediation at that point had caused "continued migration of ground water pollution." (ECF No. 155-13 at 253–66.) The 2002 CAO asserts the same conclusion, adding that the waste discharge and "subsequent migration have caused a condition of pollution in the El Cajon [Hydrologic Subarea] and impacted its suitability for designated beneficial uses," and that existing monitoring wells were inadequate to define the extent of the plume. (*Id.* at 268–72.) The 2009 CAO—to which Ametek agreed (ECF No. 155-21 at 548)—adds that "[c]ontinued discharges of wastes from soil to groundwater, and continued migration of chlorinated solvents in the groundwater have caused violations of applicable water quality standards" approximately one mile downgradient of the Facility. (ECF No. 155-14 at 274–93.) Brown's report states that TCE in the groundwater was migrating by 2010 at a rate of 146 feet per year, and also notes that between 1990 and 2016, the TCE concentration in the groundwater under the Facility rose from 62,800 ug/L to 150,000 ug/L. (ECF No. 155-24 at 627, 633.) The Court also notes that, within Brown's report, he explains that because

the current P&T system does not capture all of the groundwater contamination up-gradient of MES and Plaintiff's properties, "contaminated groundwater is still migrating onto the MHPs." (*Id.* at 621.) Finally, Truong Mai—Rule 30(b)(6) representative for ERM—testified that the monitoring wells were currently observing TCE beneath the park properties, and that certain groundwater wells were not capturing all of the groundwater passing into the mobile home parks.[6] (ECF No. 155-18 at 400–05, 407–08.)

Plaintiffs filed this action on July 10, 2015, asserting claims of negligence, gross negligence, private nuisance, and trespass.[7] Plaintiffs seek (1) "monetary damages for the cost to abate the continuing nuisance" on their properties and (2) punitive damages. (ECF No. 155 at 9.) On November 30, 2017, Ametek filed the instant motion for summary judgment. (ECF No. 135, *abrogated by* ECF No. 141.) Plaintiff filed a response (ECF No. 155), and Ametek filed a reply (ECF No. 158). After issuing a tentative ruling (ECF No. 166), the Court held a hearing on the motion on February 15, 2018 (ECF No. 167). During that hearing, the Court instructed the parties to file supplemental briefing on the issue of whether Plaintiff could seek injunctive and/or declaratory relief in this case. The parties filed timely memoranda. (*See* ECF Nos. 172, 174, 177.)

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of material fact is genuine if there is sufficient evidence for a reasonable

---

[6] Throughout this exchange during Truong's deposition, Defendants' counsel objected to questions relating to whether groundwater was continuing to bring new contaminants under the park properties, asserting that the questions called for expert opinion and speculation. The Court considers Mai's statements to the extent that they represent ERM's findings, which are documented in its reports. As the Rule 30(b)(6) representative, Mai had authority to discuss the contents of ERM's reports; that information is neither a matter of opinion nor speculation.

[7] Plaintiffs also asserted claims of public nuisance, trespass ultrahazardous activity, and strict liability, but the Court dismissed those claims in an earlier order. (ECF No. 34.)

jury to return a verdict for the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017) (quoting *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015)). "The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Id.* The Court may also grant partial summary judgment on any "part of each claim" asserted by Plaintiffs, such as whether a particular form of relief is legally obtainable. *See, e.g.*, *Highwire Promotions, LLC v. Legend Mktg. LLC*, 263 F. App'x 564 (9th Cir. 2008) (affirming a district court's partial summary judgment in favor of defendant on the issue of whether plaintiff could obtain consequential damages).

## III. Discussion

For the reasons explained below, the Court concludes that (1) federal law does not preempt Plaintiffs' claims; (2) California's environmental cleanup statute bars Plaintiffs from obtaining damages for future remediation costs; (3) California tort law does not permit an award of damages for future remediation costs under the circumstances of this case; and (4) Plaintiffs' claims are timely.

### A. CERCLA Preemption

Ametek contends that the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, preempts Plaintiffs' tort claims. According to Ametek, there is a direct conflict between Plaintiffs' use of state tort law in this case and CERCLA. The Court disagrees with Ametek.

When addressing an assertion of federal preemption, the Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 768 (9th Cir. 2015) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "A presumption against preemption applies generally, but is especially strong when, as here, 'Congress has legislated in a field which the states have traditionally occupied,'" such as tort law. *Chinatown Neighborhood Assoc. v. Harris*, 794 F.3d 1136, 1141 (9th Cir. 2015) (quoting *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 674 (9th Cir. 2013)). "Congressional intent governs our

determination of whether federal law preempts state law. If Congress so intends, '[p]re-emption . . . is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 941 (9th Cir. 2002) (quoting *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1267 (11th Cir. 2000)).

"CERCLA does not completely occupy the field of environmental regulation." *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1114 (9th Cir. 2000). "Indeed, CERCLA includes several provision indicating Congress's desire to avoid interfering with state law claims." *KFD Enters., Inc. v. City of Eureka*, No. 08-cv-4571-SC, 2014 WL 1877532, at *10 (N.D. Cal. May 9, 2014) (citing 42 U.S.C. § 9614(a) ("Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances . . ."); *id.* § 9652 ("Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants.")). Ametek nonetheless asserts that this case presents an instance of conflict preemption, which occurs when "'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101 (1989)). Even when a party presents a theory of implied conflict preemption, however, the "presumption against preemption [still] applies." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015).

According to Ametek, there is a conflict between Plaintiffs' claim for remediation damages and the purposes of CERCLA because "Plaintiffs assert they can do a better job of remediating the plume than the agencies are doing in conjunction with Ametek." (ECF No. 135-1 at 9.) Because Brown's proposed remediation plan alters Ametek's current remediation efforts—which are subject to DTSC approval and oversight—

Ametek asserts that "Brown's estimates are expressly predicated on criticism of the current cleanup efforts" (*id.*), which is contrary to CERCLA's purpose.

Ametek relies primarily on the decision in *City of Modesto Redevelopment Agency v. Dow Chemical Company*, No. 999345/999643, 2005 WL 1171998 (Cal. Super. Ct. Apr. 11, 2005) ("*Dow*"), in which the court granted a motion in limine after concluding that the plaintiff's claims for remediation damages were preempted by CERCLA. The *Dow* decision—which involved facts similar to this case—offers a thorough analysis of the relevant authorities at issue; an in-depth review of its reasoning is thus helpful.

In *Dow*, Modesto's Redevelopment Agency (the "City") brought suit against several defendants under California law as a result of the defendants' contaminating city water with PCE and TCE. Four contamination sites were at issue in the case. One of the sites was "designated by the EPA and DTSC as a joint Federal/State site under CERCLA and HSAA," *id.* at *3, and the remaining three involved state agencies only, *id.* at *4–7. Just as Plaintiffs allege here, the City in *Dow* alleged "that there [was] no CERCLA or HSAA cleanup plan that applies to the contaminated property for which they seek damages," that no "state or federal agency ha[d] plans to remove [contamination] from City property," and that the current remediation plans were "designed only to limit further damage and not to fully remediate contamination." *Id.* at *6–7. The City sought to "recover, for these kinds of alleged property damage, the costs of remediating [the] contamination as measured by future remediation costs." *Id.* at *6. The City offered the expert opinion of Anthony Brown, who prepared a feasibility study and proposed several remedial alternatives costing a total of $40 million. *Id.* at *7–9. One of the *Dow* defendants moved to exclude Brown's remediation proposal on the ground that CERCLA preempted (and HSAA barred) the City's claim for damages based on future remediation costs.

The *Dow* court first addressed the CERCLA preemption issue, looking to Congress' purposes in enacting that statute. In relevant part, the court noted that "Congress enacted CERCLA to provide the federal government with authority to react to

threatened environmental risks and to ensure recoupment of past and future response costs." *Id.* at \*10. "CERCLA requires a complete cleanup. It is designed to attack and eliminate all contamination, from source to destination." *Id.* "Under CERCLA," the court explained, "after spending money in response to an environmental hazard, a party may then obtain reimbursement for its initial outlays, as well as a declaration that the responsible parties will have continuing liability for the costs of finishing the job." *Id.* at \*11 (citing *In re Dant & Russell, Inc.*, 951 F.2d 246, 249–50 (9th Cir. 1991) (explaining that CERCLA requires plaintiffs "to take some positive action before coming to court" so that "the dispute will be ripe for judicial review," but still "not requiring plaintiffs to perform full cleanup before coming to court," thereby "substantially reduc[ing] the risk involved in performing the cleanup")). CERCLA does not, however, "authorize the recovery of costs to be incurred in the future. This encourages actual cleanup. 'Since CERCLA places no strings on the award of response costs, allowing recovery for future costs absent any binding commitment to incur these costs would leave no incentive to complete the cleanup.'" *Id.* (quoting *Dant & Russell*, 951 F.2d at 250). The court also noted that "CERCLA includes a 'timing-of-review' provision which divests federal courts of jurisdiction over claims constituting a challenge to a CERCLA cleanup until the cleanup is complete. The temporary withdrawal of jurisdiction applies to claims that challenge a CERCLA cleanup, whether or not the claim is brought under CERCLA." *Id.* (citing 42 U.S.C. § 9613(h); *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995); and *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 328 (9th Cir. 1995)).

Of course, the fact that challenges to CERCLA cleanups may not be made until the cleanup is completed begs the following question: what amounts to a "challenge to a CERCLA cleanup"? "Claims have been determined to constitute a challenge to a CERCLA cleanup—*and therefore are preempted*—where a plaintiff seeks: to dictate specific remedial actions; to postpone the cleanup; to impose additional reporting requirements on the cleanup; or to terminate the remedial investigation and feasibility

study and alter the methodology of a cleanup. Claims seeking to improve a cleanup also constitute a challenge to a CERCLA cleanup." *Id.* at *12 (emphasis added) (citing, *inter alia*, *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1115 (9th Cir. 2000)). Perhaps most importantly, "[c]laims allowing recovery for future costs absent any binding commitment to incur such costs also constitute a challenge to a CERCLA cleanup by leaving no incentive to actually complete the cleanup." *Id.*

Having surveyed Congress' purposes in enacting CERCLA, the court set out a list of reasons why the future remediation damages sought by the City would conflict with those purposes. The relevant items included that (1) Brown's proposed remediation was based on criticism of the current remediation plan, (2) "there are no binding commitments that plaintiffs will spend the proceeds of any judgment in this action on Mr. Brown's proposed remediation," and (3) the substantial amount of damages claimed might affect the defendants' abilities "to respond to an EPA-ordered cleanup." *Id.* at *14–15. The court concluded by emphasizing that CERCLA's preemption of the City's claim for future remediation damages "does not mean that plaintiffs are without recourse"; to the contrary, "a party is free to raise its concerns regarding the scope of current investigation and/or remediation with the EPA or other regulatory agencies. Also, as previously noted, plaintiffs have access to the courts to seek recovery of amounts previously spent by them on investigation and remediation." *Id.* at *16. Because the claims for future remediation costs conflicts with CERCLA's purposes, however, the court found that CERCLA preempted a damages award on that basis.

Here, Plaintiffs argue that Congress' power to preempt has no application in this case because the federal government is not involved in the plume's remediation, or, in other words, there is no "CERCLA cleanup" for Plaintiffs to challenge. (ECF No. 155 at 15.) The court in *Dow* rejected this argument. Acknowledging that only one of the four contamination sites had any federal involvement, the court nonetheless concluded that its preemption analysis "applies not only to the Halford's site, where the EPA has involved

itself, but also to the other three Phase I sites, *where State regulatory agencies (but not the EPA) have involved themselves.*" *Dow*, 2005 WL 1171998 at *15 (emphasis added). The court reasoned that "state law claims, such as those advanced by the plaintiffs in this case, are held to constitute a challenge to a CERCLA cleanup where 'CERCLA concerns have overlaid the site and the related litigation.'" *Id.* (quoting *Lehman Bros. Inc. v. City of Lodi*, 333 F. Supp. 2d 895, 903 (E.D. Cal. 2004)). Because the RWQCB and DTSC had "interjected themselves in investigation and/or remediation" of the sites, the court found that "CERCLA concerns overlay the four sites," and thus state law claims could not be used to obtain remedies CERCLA would otherwise prohibit. *Dow*, 2005 WL 1171998, at *15.

Keeping in mind the presumption against preemption, this Court must disagree with the *Dow* court's analysis.[8] As an initial matter, the Ninth Circuit has rejected a similar preemption argument, though the court's opinion offers little explanation or guidance. In *Stanton Road Associates v. Lohrey Enterprises*, 984 F.2d 1015 (9th Cir. 1993), plaintiff asserted CERCLA and state law tort claims against the defendant over contamination of the plaintiff's property. The plaintiff offered expert testimony that remediating the contamination would cost up to $1.1 million, and the trial court ultimately ordered defendant to pay that sum into an escrow account from which an environmental firm could withdraw funds during its remediation work. *Id.* at 1017. The district court clarified that this award was made "under both CERCLA and state law." *Id.* The Ninth Circuit held that, to the extent that the monetary award was made under federal law, CERCLA clearly prohibited it because CERCLA bars any claim for prospective damages. *Id.* at 1021. The court rejected, however, the defendant's argument that CERCLA preempted the award to the extent that it was based on state law. *Id.* at 1021–

---

[8] Plaintiffs also point out that the California Court of Appeal recently issued a decision reversing the Superior Court in *Dow*. *See City of Modesto v. Dow Chem. Co.*, No. A13-4419, 2018 WL 317043 (Cal. Ct. App. 2018). That decision, however, did not disturb the Superior Court's ruling on the motion in limine.

22.  The court did not provide explanation other than noting that "the express language of [CERCLA] defeats Lohrey's contention that CERCLA preempts a state law recovery." *Id.* at 1022.

Even without the benefit of a helpful explanation, the Court agrees with the Ninth Circuit's conclusion.  Though Congress clearly intended to preempt state law claims seeking prospective damages when the federal government is involved in a cleanup, *see Dant & Russell*, 9514 F.2d at 249–50, neither the *Dow* court nor Ametek identifies evidence of congressional intent to preempt state law claims when the federal government is *completely uninvolved* in the cleanup.  When the Court begins, as it must, with the presumption that Congress has not intended to preempt state law, this lack of evidence cannot be ignored.  While "[t]he concerns identified by the [*Dow*] court may well fuel persuasive policy arguments favoring CERCLA's approach to future cost recovery[, t]he court's conclusion that Congress made a prudent policy choice not to include a future cleanup cost remedy in CERCLA does not [] mean that Congress enacted CERCLA to prohibit future cost recovery in all private cleanup cost disputes."  Ronald G. Aranovsky, *A Preemption Paradox: Preserving the Role of State Law in Private Cleanup Cost Disputes*, 16 N.Y.U. Envtl. L.J. 225, 303 (2008).  Not only would preemption in this scenario raise "significant federalism concerns," it also "risks transforming CERCLA conflict preemption into *de facto* field preemption by prohibiting the application . . . of state law that reflects approaches to contaminated property issues differing from those found in CERCLA."  *Id.* at 304–05 (footnote omitted).

The only other case law Ametek cites for its CERCLA preemption argument is *Lehman Bros.*, which did not address this issue.  There, the court had to determine whether it possessed subject matter jurisdiction over the plaintiff's state law contract claims.  *Lehman Bros.*, 333 F. Supp. 2d at 901–03.  Because related litigation involved CERCLA claims, the court found that the plaintiff could not avoid CERCLA's exclusive federal jurisdiction provision merely because its claims relied on state law rather than CERCLA.  *Id.*  The court did not engage in any analysis with respect to whether the

presumption against preemption is overcome in this context.

In sum, while CERCLA expresses a clear policy choice of prohibiting future restoration damages, Ametek offers no evidence that Congress intended to preempt state law claims arising from contamination when the federal government is uninvolved in the cleanup. In the absence of such evidence, the Court finds that CERCLA does not preempt Plaintiffs' claims.

### B. Whether State Law Permits Future Remediation Cost Damages

The remainder of Ametek's motion asserts that Plaintiffs' claim for future remediation costs is not permitted under California law. As explained below, the Court agrees with Ametek that future remediation costs are inappropriate under the facts of this case because doing so would (1) frustrate the purposes of HSAA, and (2) produce an unacceptable risk of double recovery.

### i. Frustration of HSAA's Framework

The Carpenter-Presley-Tanner Hazardous Substance Account Act, or HSAA, is California's "counterpart to CERCLA." *City of Lodi v. Randtron*, 13 Cal. Rptr. 3d 107, 115 (Ct. App. 2004). California enacted HSAA with three express purposes: (1) "[e]stablish a program to provide for response authority for releases of hazardous substances, including spills and hazardous waste disposal sites that pose a threat to the public health or environment," (2) "[c]ompensate persons, under certain circumstances, for out-of-pocket medical expenses and lost wages or business income resulting from injuries proximately caused by exposure to hazardous substances," and (3) "[m]ake available adequate funds in order to permit the state of California to assure payment of its 10-percent share of the costs mandated pursuant to Section 104(c)(3) of [CERCLA]." Cal. Health & Safety Code § 25301. "To implement these purposes, HSAA provides a comprehensive and detailed scheme to ensure the timely and cost-effective cleanup of hazardous substance release sites," by "establish[ing] authority, procedures, and standards to carry out the investigation, removal and remediation of contaminated sites," "issu[ing] and enforc[ing] a removal or remedial action order to any" responsible party,

"impos[ing] administrative or civil penalties for noncompliance of an order,"
"recover[ing] costs and expenses incurred by the DTSC in carrying out HSAA," and
"apply[ing] for compensation of loss caused by the release of a hazardous substance."
*City of Lodi*, 13 Cal. Rptr. 3d at 116 (citing the respective HSAA provisions).

By reference to CERCLA, HSAA defines a contamination site as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." Cal. Health & Safety Code § 25323.9 (incorporating by reference 42 U.S.C. § 9601(9)). Because the contamination originating from Ametek's facility has "come to be located" at Plaintiffs' properties, the DTSC is responsible for overseeing the remediation of Plaintiffs' properties. *See Dow*, 2005 WL 1171998, at *18 ("[B]y adopting the NCP and CERCLA's definition of 'site,' HSAA requires that any cleanup proceed according to a comprehensive scheme consistent with the federal model and that cleanup address any area where a hazardous substance comes to be located.").

Ametek argues that HSAA prohibits Plaintiffs from claiming damages based on future remediation costs. Again, *Dow* offers a helpful starting point. In addition to concluding that CERCLA preempted the City's claims, the *Dow* court also found that HSAA barred future remediation cost damages. "Under HSAA," the court explained, the DTSC has the sole responsibility" for coordinating agency involvement "and for ensuring that all response actions at [the contamination site] are carried out so as to be consistent with the statutory scheme." *Dow*, 2005 WL 1171998, at *17. Because the City proposed to implement its own remediation program for its properties, its claim for future remediation costs "squarely conflict[s] with the DTSC's sole responsibility under HSAA by calling for remediation according to Mr. Brown's recommendations." *Id.* Even with respect to the sites that were not listed by the DTSC, it was "clear that the DTSC, or the RWQCB acting in coordination with the DTSC, has exercised its discretion under HSAA to approve remedial action," and the City's claim for future remediation costs would "interfer[e] with the statutory exercise of discretion by state regulatory agencies to direct and approve remedial action." *Id.* at *18. More generally, the court

17

explained, because "HSAA is California's counterpart to CERCLA and seeks to accomplish the same goals by employing the same kind of comprehensive statutory scheme," its conclusion that CERCLA did not permit the City's claims for future remediation costs also meant that HSAA does not permit such damages. *Id.* at *18–19.

Plaintiffs respond first by arguing that the proposition that HSAA precludes future remediation damages was rejected in *People of California v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073 (S.D. Cal. 2008) (*Kinder I*). There, the defendants—a group of business entities who allegedly caused water contamination—argued that the plaintiffs had failed to exhaust administrative remedies before bringing a tort action because their claims attempted to "second-guess and override the Regional Board's expert authority on remediating" the contamination. *Id.* at 1079. The court disagreed, explaining that California courts "have long held that the Water Boards' administrative authority, while extensive, does not displace the court's own substantial jurisdiction to declare nuisances and grant damages to injured property owners." *Id.* at 1081. "It is then clear that when a plaintiff's claims and a Regional Board's order involve the same common events or facts, the Regional Board's right to govern remediation is not inconsistent with a plaintiff's right to prosecute their damage claims." *Id.* at 1082. In other words, "[t]he fact that the Regional Board has the power to order a defendant to do something does not deprive a court the power to enjoin the same acts." *Id.*

While the *Kinder I* court concluded that HSAA does not bar any private suit relating to a cleanup, it did not speak to the validity of damages based on future remediation damages. In fact, the *Kinder I* court expressly left open the question of what remedies could be appropriate in that case, concluding that choosing the appropriate remedy was not "necessary to resolve Defendants' Rule 12(b)(6) motion." *Id.* at 1082 n.2. In other words, according to the *Kinder I* court, "the fact that Plaintiffs ask for more than what the Court might ultimately be able to award them is not fatal under Rule 12(b)(6)"; rather, the issue of the appropriate remedy "is better suited for a motion to

strike *or for summary judgment*." *Id.* (emphasis added). Because the parties have reached that stage in this case, the Court must now address what remedies are available to Plaintiffs.

Plaintiff's citation to *People v. City of Los Angeles*, 325 P.2d 639 (Cal. 1958), fares no better, as that court merely reached the same conclusion as the *Kinder I* court, *i.e.*, the fact that a state agency is involved in a contamination cleanup does not deprive a court of jurisdiction to address related tort claims. *See id.* at 642–43 ("There is nothing in the act which expressly or impliedly places in the state board or any regional board the exclusive power to declare that a nuisance exists or to take action to abate a nuisance.").

Under the circumstances of this case, awarding Plaintiffs damages for un-incurred, future remediation costs would run contrary to HSAA. As just discussed, HSAA gives primary authority to the California agencies in determining the proper remediation plan. Here, Plaintiffs have not yet requested approval from the California agencies to initiate Brown's remediation proposal, and any future remedial action at their properties would be subject to agency approval. (*See* ECF No. 155-1 at 53–59.[9]) By awarding Plaintiffs

---

[9] Plaintiffs "dispute" these two propositions in response to Ametek's statement of undisputed facts (*see* ECF No. 155-1 at 53–59), but their responses are irrelevant. Plaintiffs assert in their response that (a) "Plaintiffs seek to recover the cost of a proposed remediation plan only as to their own MHP properties," (b) their "proposed remediation plan will not interfere with or alter the Remedial Action Plan," (c) the current Remedial Action Plan "does not include any remediation activities on Plaintiffs' MHP properties," (d) "[a]ll remedial activities are occurring at the Facility or MES," (e) to date, Ametek "has never proposed any remediation measures to on Plaintiffs' properties to address the TCE contamination that Ametek caused, and no agency has either required or requested any such remediation measures," (f) the current remedial measures "do not address the contamination that exists on Plaintiffs' properties," (g) the current remedial measures "are intended only to address the core strength of the plume," (h) the contamination of Plaintiffs' properties will persist for 50 years or more without additional remedial actions, (i) remedial activities on Plaintiffs' properties "are necessary to address the TCE contamination," and (j) when RWQCB employees were asked during a deposition "whether a proposed plan by Plaintiffs for remediation of their own property would be approved," the employees suggested "there would be no reason that such a plan would not be approved."

Of all of those just listed, the only potentially relevant response is (j), which asserts that RWQCB employees thought that the DTSC would approve a remediation plan proposed by Plaintiffs. But the evidence cited does not support that assertion. In fact, one of the cited pieces of evidence suggests that the DTSC would reject Brown's proposed remediation plan. First, Plaintiffs cite a portion of Laurie

19

damages equal to the cost of a remediation plan that the agencies have not even considered, the Court would effectively usurp the agencies' primary authority to supervise remediation under HSAA. Because this particular form of relief—under the specific facts of this case—would run contrary to the structure of HSAA, the Court concludes that future remediation damages are not appropriate. Again, to be sure, *City of Los Angeles* and *Kinder I* instruct that the DTSC's current involvement does not deprive the Court of the ability to address Plaintiffs' tort claims. But what *remedies* are appropriate under the circumstances of this case is another question. Here, relief in the form of damages based on the cost of a specific remediation plan—in light of the agencies' authority to manage remediation—would not be appropriate. As discussed further below in Section III.B.iii, however, at least one other form of relief, declaratory relief, is available to Plaintiffs.

Plaintiffs alternatively contend that HSAA does not bar their request for damages to implement Brown's remediation proposal in the future because Brown's proposal does not affect the current remediation plan governed by DTSC. The Court disagrees. Just as in *Dow*, while there are no remediation activities *on* Plaintiffs' property, the remediation governed by DTSC is intended to remediate the contamination that has reached Plaintiffs' properties. The remediation is "ongoing and dynamic, not static," and there is "no evidence to remotely suggest that these ongoing remediation efforts are either limited to current systems or final in any way." *Dow*, 2005 WL 1171998, at *15 (citing *New*

_____

Walsh's deposition in which she states that Senior can alter the Facility property so long as it does not impact or impede the cleanup. (ECF No. 155-18 at 458–59.) Next, Sean McClain testified that Plaintiffs *could* propose an alteration to the remediation plan. (ECF No. 155-36 at 1156–59.) Next, Thomas Johnson testified that he could not remember whether other employees thought that such a plan would be approved, and suggests that Plaintiffs' proposal "interfere[s] with what is already ongoing at" MES. (ECF No. 155-5 at 101–03.) Finally, Eric Nichols testified in defense of his conclusion that "any voluntary cleanup application *would be rejected as unnecessary, inconsistent with the intent of the voluntary cleanup program*, duplicating and potentially interfering with existing investigation into remediation activities." (ECF No. 155-36 at 1137–38.) None of Plaintiffs' responses or the evidence cited suggest that (1) Plaintiffs would not need approval to initiate Brown's remediation plan, or (2) that such a proposal would be approved by a relevant agency.

*Mexico v. Gen. Elec. Co.*, 322 F. Supp. 2d 1237, 1271 (D.N.M. 2004)). Contrary to Plaintiffs' assertion, the RWQCB's 2017 letter to Ametek does not indicate that the remediation effort is static or completed; rather, it states that regulatory oversight of the remediation effort has been transferred to the DTSC, and that Ametek must continue to abide by the directives in the 2009 CAO. (ECF No. 155-36 at 1132.)

Because awarding Plaintiffs damages for future remediation costs is contrary to the statutory scheme set forth in HSAA, the Court finds that HSAA bars Plaintiffs' claims for such damages.[10]

### ii. Risk of Double Recovery

In addition to frustrating the agency-oriented purposes of HSAA, a damages award based on future remediation costs under the circumstances of this case would create a risk of double recovery that California tort law does not permit.

The types of compensable damages in this case depend on whether Plaintiffs are pursuing their tort claims under a "continuing" or "permanent" theory. Under California law, "a trespass [or nuisance[11]] may be continuing or permanent." *Starrh & Starrh Cotton Growers v. Aera Energy LLC* ("*Starrh*"), 63 Cal. Rptr. 3d 165, 170 (Ct. App. 2007). "In general, a permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff must bring successive actions." *Beck Dev. Co. v. S. Pac. Transp. Co.* ("*Beck*"), 52 Cal. Rptr. 2d 518,

---

[10] In a two-sentence footnote, Plaintiffs assert that Ametek should be precluded from asserting its "preemption arguments" under the doctrine of laches because Ametek raises these issues for the first time at summary judgment. (ECF No. 155 at 18 n.4.) Plaintiffs fail to explain whether laches applies in this situation, and even assuming it does, how Ametek's delay in asserting this argument has prejudiced Plaintiffs. *See Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 954 (S.D. Cal. 2016) (a claim of laches requires a showing of "both an unreasonable delay" and "prejudice" suffered by the party invoking the doctrine).

[11] "[G]enerally the principles governing the permanent or continuing nature of a trespass or nuisance are the same and cases discuss the two causes of action without distinction." *Starrh & Starrh Cotton Growers v. Aera Energy LLC* ("*Starrh*"), 63 Cal. Rptr. 3d 165, 172 (Ct. App. 2007).

556 (Ct. App. 1996).

> The cases finding the nuisance complained of to be unquestionably permanent in nature have involved solid structure, such as a building encroaching upon the plaintiff's land, a steam railroad operating over plaintiff's land, or regrade of a street for a rail system. In such cases, plaintiffs ordinarily are required to bring one action for all past, present and future damage within three years after the permanent nuisance is erected. . . . Damages are not dependent upon any subsequent use of the property but are complete when the nuisance comes into existence.
>
> On the other hand, if a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring successive actions for damages until the nuisance is abated. Recovery is limited, however, to actual injury suffered prior to commencement of each action.
>
> The classic example of a continuing nuisance is an ongoing or repeated disturbance, such as . . . noise, vibration or foul odor. Indeed, even more substantial physical invasions of land have been held to be continuing in character.

*Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 868–70 (Cal. 1985) (internal quotation marks, citations, and footnotes omitted). A trespass or nuisance claim based on pollution may also be considered continuing if a plaintiff shows that "contaminants continue to migrate through land and groundwater causing new and additional damage on a continuous basis," *Beck*, 52 Cal. Rptr. 2d at 557, 558, or when "the nuisance can be remedied at a reasonable cost by reasonable means," *Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1229 (Cal. 1996).

In a close case, the plaintiff gets to choose between presenting a continuing or permanent tort theory. *Baker*, 705 P.2d at 871 ("In case of doubt as to the permanency of the injury the plaintiff may elect whether to treat a particular nuisance as permanent or continuing."). Plaintiffs here make clear that they have chosen to pursue only a continuing tort theory. (ECF No. 155 at 10 ("Plaintiffs are not seeking to recover diminution in value damages against Ametek, *particularly because this is not a permanent nuisance*, but rather a nuisance which can be reasonably abated.").) But even if it were not Plaintiffs' choice to make, there is sufficient evidence to create a genuine

issue[12] that the plume in this case is a continuing, not permanent, nuisance and trespass. *See Beck*, 52 Cal. Rptr. 2d at 556–57 ("While a plaintiff's election of remedies is entitled to deference in doubtful cases, that choice must nevertheless be supported by evidence that makes it reasonable under the circumstances. . . . It is only where the evidence would reasonably support either classification that the plaintiff may choose which course to pursue."); *id.* at 557 ("[W]e should uphold the plaintiff's choice of characterization if it is reasonable to do so under a given formulation."). For example, Brown notes in his report that the contamination "is still migrating onto the MHPs." (ECF No. 155-24 at 621.) The 2009 CAO also asserts that continued discharges of waste continue to migrate approximately a mile downgradient of the Facility. And perhaps most importantly, the DTSC's and RWQCB's continuous efforts to remediate the contamination suggests that the contamination is abatable. *Cf. Capogeannis v. Super. Ct.*, 15 Cal. Rptr. 2d 796, 805 (Ct. App. 1993) (using the fact that "responsible public agencies" were engaging in a cleanup effort as evidence that the contamination was abatable, thus permitting plaintiffs to pursue a continuing tort theory). Based on this evidence, a jury could reasonably find that (1) contaminants continue to flow into Plaintiffs' properties, and (2) the contamination is abatable. *See, e.g.*, *Diamond X Ranch LLC v. Atlantic Richfield Co.*, No. 3:13-cv-00570-MMD-WGC, 2017 WL 4349223, at *7–8 (D. Nev. Sept. 29, 2017) (denying summary judgment on this issue in part because even though the defendant had ceased the pollution-causing activity, there was "evidence in the record indicating that [pollutants] from the Mine continues to release into and within the Bryant Creek watershed, contaminating the Property").

Having concluded that Plaintiffs' choice to bring a continuing tort action is appropriate, the Court must determine which damages Plaintiffs may seek. Particular categories of damages are unavailable to a plaintiff bringing a continuing tort action. For

---

[12] "Generally, whether a trespass is continuing or permanent is a question of fact properly submitted to the jury." *Starrh*, 63 Cal. Rptr. 3d at 175.

example, a continuous tort plaintiff may not obtain damages based on diminution of property value.[13] *See Sante Fe P'ship v. ARCO Prods. Co.*, 54 Cal. Rptr. 2d 214, 217–20 (Ct. App. 1996); *FDIC v. Jackson-Shaw Partners*, 850 F. Supp. 839, 843 (N.D. Cal. 1994). Instead, a plaintiff pursuing a continuing tort claim is limited generally to damages for (1) loss of use and (2) remedial costs. *ARCO*, 54 Cal. Rptr. 2d at 222 ("California law limits damages for continuing trespass and continuing nuisance to abatement and loss of use."). Here, Plaintiffs have not offered any evidence of loss of use, and they disclaim any such damages. (ECF No. 155 at 28 ("Plaintiffs do not allege loss of use of their properties . . .").) The only category compensable damages left for Plaintiffs is thus the cost of abatement.

Plaintiffs contend that, under the circumstances of this case, California law permits damages for *future* remediation costs because the abatement program proposed by Brown is "reasonable." In other words, Plaintiffs assert that under their continuing tort theory, they may recover damages equal to the approximate cost of remediating the contamination, which Plaintiffs would presumably incur in the future.

Before addressing Ametek's response, the Court notes that this theory of recovery—damages for costs Plaintiffs have yet to incur—seems incompatible with the underlying logic of a continuing tort claim. As just discussed, the main difference between continuing and permanent tort theories is that while permanent-tort plaintiffs may recover damages for past and future costs, continuing-tort plaintiffs are limited "to actual injury suffered *prior to commencement* of each action." *Baker*, 705 P.2d at 869 (emphasis added). The Court struggles to understand how awarding Plaintiffs damages for costs they have not yet incurred compensates an injury "suffered prior to the commencement" of this action. Nonetheless, at least one California Court of Appeal has

---

[13] Plaintiffs admit as much, and they expressly disavow any claim for damages based on diminution of value. (ECF No. 155 at 10 ("Plaintiffs are not seeking to recover diminution in value damages against Ametek, particularly because this is not a permanent nuisance, but rather a nuisance which can be reasonably abated.").)

reviewed an award for future remediation costs under similar circumstances without expressing any concern over this contradiction. In *Starrh*, the plaintiff—owner of farmland whose groundwater had been contaminated by a neighbor's oil production—presented evidence at trial "of a restoration plan for returning the underlying groundwater to its native condition." 63 Cal. Rptr. 3d at 170. The jury awarded the plaintiff $3.8 million for the costs of this restoration plan. *Id.* at 177. While the Court of Appeal reversed on the ground that the jury instructions were erroneous, it did not express any concern about the fact that the plaintiff had not yet incurred any costs related to remediation. The court referenced on multiple occasions California Civil Code § 3334(a), which states "[t]he detriment caused by the wrongful occupation of real property . . . is deemed to include the value of the use of the property for the time of that wrongful occupation . . . , *the reasonable cost of repair or restoration of the property to its original condition*, and the costs, if any, of recovering the possession." While this Court would otherwise be tempted to conclude that § 3334(a) should be viewed in accordance with the limitations placed on damages available to continuing-tort plaintiffs (*i.e.*, such plaintiffs can recover damages enumerated in § 3334(a) only to the extent that they were incurred prior to the verdict), this Court must follow a California Court of Appeal's guidance (in the absence of any comment by the Supreme Court of California) on the meaning of California law. *See, e.g.*, *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 735 (9th Cir. 1986). Thus, in the absence of any other authoritative discussion on this issue, the Court must assume—in light of *Starrh*—that California law does not categorically bar a continuing-tort plaintiff from seeking future remediation costs.

But the conclusion that California law, under certain circumstances, might permit damages equal to future remediation costs, does not mean that Plaintiffs can seek such damages under the circumstances of *this* case. There is a crucial distinguishing difference between the facts of this case and *Starrh*: whereas the opinion in *Starrh* does not acknowledge any involvement by the California agencies in remediating the contamination at issue in that case, here the agencies are actively and dynamically

involved the remediation of the plume created by Ametek. As explained below, because it is quite possible in this case that the California agencies may order Ametek to implement further procedures on Plaintiffs' properties and/or reject Brown's remediation proposal, an award based on future remediation costs would produce an unacceptable risk of double recovery.

Ametek argues that Plaintiffs may not obtain future remediation costs here because, under the circumstances of this case, awarding such damages will produce an unacceptable risk of double recovery.[14] The Court agrees. If the Court were to award the damages that Plaintiffs seek, there is no way to ensure that Plaintiffs will end up paying that amount in remediation costs because the agencies might require Ametek to perform at least some direct remediation of Plaintiffs' properties at no cost to Plaintiffs. If that occurs, Plaintiffs will have received a double recovery. The Supreme Court of California has held in a contamination case that it is error for a trial court to award relief that permits double recovery. In *Spaulding v. Cameron*, 239 P.2d 625 (Cal. 1952), the court held that the trial court erred by awarding both injunctive relief and damages because "[i]f the defendant obeys the injunction . . . there will no longer be a threat to depreciate the value of the property," so a damages award would amount to a double recovery for the plaintiff. *Id.* at 629. The same result could occur if the Court here awarded Plaintiffs the damages they seek. To be sure, awarding the damages Plaintiffs request here does not *guarantee* a double recovery as the relief awarded by the trial court in *Spaulding* did, but that fact does not make the serious risk of double recovery here any less troublesome. Because under California law "[t]he general rule of compensatory damages bars double recovery for the same wrong," *Krusi v. Bear, Stearns & Co.*, 192 Cal. Rptr. 793, 798 (Ct. App. 1983), the risk of double recovery makes the damages Plaintiffs seek inappropriate. *See*

---

[14] Ametek also argues that Plaintiffs cannot obtain future remediation costs because Brown's proposal is speculative and therefore unreasonable. Because the Court agrees that under the facts of this case the substantial risk of double recovery precludes an award based on future remediation damages, it need not address Ametek's additional argument.

*also Gehr v. Baker Hughes Oil Field Operations, Inc.*, 81 Cal. Rptr. 3d 219, 667 n.7 (Ct. App. 2008) (explaining that the risk of double recovery is the reason why a court may not grant damages to a continuing-tort plaintiff "for both diminution in value and the cost of remediation").

Plaintiffs assert that precluding them from seeking future remediation cost damages at this point turns "tort law upside down," and "is akin to arguing that a car accident victim, whose car is badly damaged, does not have a cognizable tort claim until he spends the money to repair the vehicle." (ECF No. 155 at 24.) Plaintiffs' argument makes sense when no regulatory agency is involved. But when, as here, a CAO has been issued and California regulatory agencies are responsible for overseeing the remediation, the prospect of damages based on prospective costs presents a serious problem. To use Plaintiffs' analogy, it is as if after the accident, the State of California required the driver responsible for the accident to repair the victim's car (albeit perhaps not in the way the victim would prefer) at the responsible driver's cost. In that scenario, ordering that the responsible driver also pay *the victim* the cost of fixing his vehicle not only results in a potential windfall for the victim, but also subjects the responsible driver to excessive liability.

A noteworthy discussion of the impropriety of future remediation cost damages under these circumstances came in response to a motion for new trial filed by the defendant in *Walnut Creek Manor, LLC v. Mayhew Center, LLC*, No. C 07-5664 CW, 2010 WL 653561 (N.D. Cal. Feb. 22, 2010). There, a jury found for the plaintiff on tort claims relating to contamination caused by the defendant. *Id.* at *1. The jury's damages award included $1.597 million in "future damages." *Id.* That specific amount was suggested by the plaintiff's expert as the cost of remediating the plaintiff's contaminated soil. *Id.* at *4. In its motion, the defendant argued, *inter alia*, that (1) "the future damages award may constitute a double recovery depending on the Water Board's future actions," and (2) "the damages award contravenes public policy because it includes no assurance that, to the extent it was based on the cost of remediation, it will be used for

that purpose." *Id.* at *5, *6. With respect to the former argument, the court agreed that "[i]f the Water Board orders [defendant] to remediate the [plaintiff's] property, and it does so, as well as pays the full future damages award, this could constitute an impermissible double recovery." *Id.* at *5. As to the latter argument, the court noted that it was "troubled" by the absence of any assurance that the plaintiff would use the damages to remediate the contamination on its property, and for that specific reason the court instructed the jury: "If you find [defendant] liable for nuisance, the Court will issue an order requiring [defendant] to abate the contamination on [plaintiff's] property." *Id.* at *6.

The same risks that troubled the court in *Walnut Creek Manor* apply to Plaintiffs' request for future remediation cost damages here. Such an award risks double recovery and would not be conditioned on Plaintiffs performing any actual remediation work. It is also worth noting that if the *Walnut Creek Manor* court had enforced the jury's "future costs" damages awarded *and* ordered the defendant to abate the contamination, the court would have committed exactly the same error as the trial court in *Spaulding*.

In sum, the Court finds California law's prohibition of double recovery makes a damages award in this case based on future remediation costs improper.[15]

### iii. Other Available Remedies

That Plaintiffs may not be able to obtain damages for future remediation costs in

---

[15] Ametek also contends that Plaintiffs' claims are barred by the applicable three-year statute of limitations. *See* Cal. Civ. Proc. Code § 338(b). Because Plaintiffs' claims are based on the theory that the contamination plume is a continuing—not permanent—nuisance and trespass, however, the claims are timely. The statute of limitations cannot bar Plaintiffs' continuing trespass and nuisance claims because each trespass "begins anew with each injury." *Starrh*, 63 Cal. Rptr. 3d at 171; *see also Kinder I*, 569 F. Supp. 2d at 1085 ("A continuing nuisance may exist even if a defendant's harmful conduct ended more than three years before a plaintiff filed suit. This is because the 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur." (citation omitted)); *Mangini v. Aerojet-General Corp.*, 281 Cal. Rptr. 827, 838 (Ct. App. 1991) ("[W]here a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run upon creation of the nuisance. Where a continuing nuisance is alleged, every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance.").

this case, however, does not compel the conclusion that Ametek is entitled to full summary judgment. Other forms of relief might be available, such as injunctive or declaratory relief. After all, "an affected party need not wait until actual injury occurs before bringing an action to enjoin a nuisance." *Beck*, 52 Cal. Rptr. 2d at 553–54; *see also FDIC v. Jackson-Shaw Partners No. 46, Ltd.*, No. 92-20556 SW, 1994 WL 669879, at *2 (N.D. Cal. Nov. 18, 1994) (noting that plaintiff was entitled to injunctive relief as a result of its continuing tort claim); *City of Los Angeles*, 325 P.2d at 643–44 (suggesting that "private persons" may seek an injunction from courts to enjoin a contamination).

During the hearing on this motion, the Court instructed the parties to file supplemental briefing on this issue. In particular, the Court asked whether the operative complaint could be seen to ask for injunctive or declaratory relief; if not, whether amendment should be permitted; and with respect to injunctive relief, how the Court could craft an effective injunction. The Court instructed the parties to file sequential briefs, which the parties timely submitted.[16] (ECF Nos. 172, 174, 177.) In its briefing, Plaintiffs state that they now seek an injunction against Ametek. Plaintiffs suggest that the Court could issue a permanent injunction ordering Ametek to "implement remediation measures directly on Plaintiffs['] properties, in a reasonable timeframe, that are: (a) consistent with the remediation proposals set forth by Plaintiffs' experts; and (b) in accordance with the direction of, and through coordination with, the [RWQCB] and DTSC." (ECF No. 172 at 13.)

Before reaching the arguments offered by the parties in their supplemental briefing, the Court must address a preliminary question: assuming the operative complaint does not request injunctive or declaratory relief, must the complaint be

---

[16] The Court notes that Plaintiffs' briefing failed to address two issues raised by the Court: (1) whether the operative complaint could be construed to request injunctive or declaratory relief, and (2) whether declaratory relief is appropriate in this case. The Court will treat the first omission as a concession that the operative complaint does not request either form of relief. As to the second omission, the Court includes a more detailed discussion below.

amended in order for Plaintiffs to obtain such relief in this case?  The answer to that question appears to be no.  Federal Rule of Civil Procedure 54(c) provides that "[e]very . . . final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  The Ninth Circuit has interpreted Rule 54(c) to mean that declaratory and injunctive relief can be awarded in a case in which the plaintiff did not request such relief in the operative complaint.  In *Arley v. United Pac. Ins. Co.*, 379 F.2d 183 (9th Cir. 1967), for example, the court rejected the defendant's argument that the district court erroneously granted declaratory relief when the operative complaint requested only rescission.  The court explained that while it was true that the "plaintiff prayed for rescission," Rule 54(c) empowered the district court to enter declaratory relief so long as there was "a justiciable controversy and [it was] a matter appropriate to settlement by declaratory judgment."  *Id.* at 187; *see also Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 202 (N.D. Cal. 2012) (citing *Arley* for the proposition that "[t]he Ninth Circuit has applied [Rule 54(c)] to uphold a court's power to award declaratory relief when that relief was not requested in the complaint"); *Gibbs v. Anchorage Sch. Dist.*, No. A94-0554 CV (HRH), 1995 WL 1036748, at *5 n.9 (D. Alaska Feb. 24, 1995) ("Plaintiff did not request declaratory relief, but that does not mean that the court cannot grant that type of relief if appropriate.  A court can grant the type of relief to which the party is entitled even if the party does not request that type of relief. . . . In this case, declaratory relief is appropriate because it will settle the legal relations at issue and will afford relief from the uncertainty giving rise to these proceedings.").  Rule 54(c) operates the same way with respect to injunctive relief: even if injunctive relief is not requested in the operative complaint, a district court may award such relief as appropriate under the circumstances.  *See Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978) (explaining that that the district court erred in refusing to provide injunctive relief on the ground that the plaintiff failed to request it in his complaint); *Vietnam Veterans*, 288 F.R.D. at 202–03 (rejecting defendants' argument that the district court erred by issuing injunctive relief when no

request for such relief existed in the complaint); *see also Mueller v. Auker*, No. CIV 04-399-S-BLW, 2010 WL 2265867, at *5 (D. Idaho June 4, 2010) (rejecting defendants' argument that the absence of a request for injunctive or declaratory relief in the operative complaint precluded plaintiffs from seeking such relief at trial, citing Rule 54(c) and *Arley*).

Cases discussing Rule 54(c) make clear that the primary limitation on a court's ability to fashion the appropriate remedy, regardless of the form of relief requested in the pleadings, is the risk of prejudice to the defendant. *See, e.g.*, *Rental Dev. Corp. of Am. v. Lavery*, 304 F.2d 839, 843 (9th Cir. 1962) ("Where the judgment is not entered by default, the trial court is ordinarily required to grant the relief to which the party in whose favor it is rendered is entitled, 'even if the party has not demanded such relief in his pleadings.' [(quoting an earlier version of Rule 54(c))] If however, it is made to appear that the failure to ask for particular relief substantially prejudices the opposing party, Rule 54(c) does not sanction the granting of relief not prayed for in the pleadings."). Here, the parties spend much of their supplemental briefing discussing whether Plaintiffs' current request for injunctive relief—it being the first time Plaintiffs have suggested injunctive relief in this case—would prejudice Ametek. Ultimately, the Court agrees with Plaintiffs that Ametek would not be prejudiced if the Court considers injunctive relief in the event that Plaintiffs prevail at trial.

Ametek argues that considering a request for injunctive relief at this juncture would prejudice Ametek because doing so will force it to undertake "an entirely new course of defense." (ECF No. 174 at 22–23.) Ametek asserts that because Plaintiffs have sought only legal remedies in this case, "Ametek elected not to present alternatives to Brown's proposed remediation plan, but instead focused on the legal infirmities with and speculative nature of Plaintiffs' damage claim based on [Plaintiffs' expert] Brown's plan." (*Id.* at 23.) If faced with a request for equitable relief, it contends, Ametek would need to be permitted an opportunity to challenge "not just the speculative nature of Brown's approach, but the merits of his plan while also proposing alternatives." (*Id.*)

31

The Court does not see how that would be the case. Ametek need not engage in any new discovery to defend the merits of Plaintiffs' claims, which assert that Ametek caused a plume of toxic contamination to spread to the groundwater beneath Plaintiffs' land. The contents of any remedial plan would not affect Ametek's defense of the merits of those claims.

Ametek argues that to comply with an injunctive order from this Court to implement Brown's plan, Ametek would need to depose witnesses from the California agencies to determine whether implementing Brown's plan would be permissible. (*Id.* at 23–24.) Deposing agency officials, however, would not be necessary to comply with the injunction. The injunction Plaintiffs propose would instruct Ametek to implement the remediation measures proposed by Plaintiffs' expert "in accordance with the direction of, and through coordination with" the appropriate California agencies. (ECF No. 172 at 13.) Complying with that injunction—assuming the Court implements an injunction similar to that proposed by Plaintiffs, which the parties should not take this discussion to suggest will occur—would not require any depositions, but rather would entail good faith coordination by Ametek with the agencies.

While they may not demonstrate prejudice resulting from the Court considering an injunction in this case, Ametek's arguments reveal troubling issues that Plaintiffs will need to confront should they prevail at trial. Based on its preliminary review of Plaintiffs' proposed injunction, the Court is concerned that it may be too vague to be enforceable. *See* Fed. R. Civ. P. 56(d) ("Every order granting an injunction . . . must [] describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required."); *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its order so that those who must obey them will know what the court intends to require and what it means to forbid."). The power of deciding whether Plaintiffs' remediation plans

can be implemented on their properties lies with the California agencies, not this Court. (*See* ECF No. 155-1 at 53–59; note 9, *supra*.)  This raises serious implementation problems: if the DTSC rejects Ametek's good-faith request for permission to implement Brown's plan, how will the Court determine whether Ametek has complied with its obligations under the proposed injunction?  Separately, how closely would Ametek's proposal to the DTSC have to align with Brown's?  What if there is a more effective remediation procedure that Plaintiffs' experts do not propose?  Because "serious penalties can befall those who are found to be in contempt of court injunctions," *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 444 (1974), these are serious questions that the Court will have to confront if Plaintiffs succeed at trial and propose the same injunction.

Anticipating such concerns, the Court asked for the parties' positions on the suitability of *declaratory* relief in this case in addition to injunctive relief.  (ECF No. 166 at 27–28 (specifically asking for the parties' positions regarding declaratory relief); ECF No. 170 at 6, 15, 16, 17, 19, 27 (discussing declaratory relief).)  The supplemental briefing, which makes no mention of declaratory relief, failed to comply with that instruction.

Declaratory relief would provide Plaintiffs (if successful at trial) with a judgment finding Ametek liable for the contamination of Plaintiffs' property.  Plaintiff could use that judgment to bring successive actions against Ametek for recoupment of costs Plaintiffs incur as they remediate their own properties.  In the Court's preliminary view, this procedure comports well with Plaintiffs' continuing tort theory.  *See Baker*, 705 P.2d at 869 ("[I]f a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring *successive actions for damages until the nuisance is abated*." (emphasis added)); *Beck*, 52 Cal. Rptr. 2d at 556 ("[A] permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff *must bring successive actions*."

(emphasis added)); *Jackson-Shaw Partners*, 850 F. Supp. at 842 ("[I]n a continuing [tort] case, the injured party may bring successive actions for damages . . . . In contrast to permanent [tort] actions, a plaintiff bringing causes of action for continuing [torts] cannot recover prospective damages." (citations omitted)). It is also worth noting that CERCLA envisions this kind of procedure. 42 U.S.C. § 9613(g)(2) ("In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."). Not only would a declaratory judgment fit well with the underlying theory of Plaintiffs' case, it would also put Plaintiffs—rather than Ametek—in the position of choosing the most effective method of remediation.

Of course, the Court need not, and should not, make the choice between injunctive and declaratory relief at this point in the litigation. If Plaintiffs succeed at trial, the Court will determine whether the injunctive relief Plaintiffs propose can be implemented. If the Court determines Plaintiffs' proposal cannot be implemented, it will consider instead awarding declaratory relief. As the advisory committee's notes to Federal Rule of Civil Procedure 57 instruct, "when coercive relief only is sought but is deemed ungrantable, or inappropriate, the court may *sua sponte*, if it serves a useful purpose, grant instead a declaration of rights." *See also Gibbs*, 1995 WL 1036748, at *5 n.9.[17]

---

[17] The Court declines to adopt the remedy procedure suggested by Plaintiffs in their supplemental brief. (*See* ECF No. 172 at 21–23.) According to Plaintiffs' proposal, the question of the cost of future remediation damages could be presented to a jury, and the Court could simultaneously entertain a request for a permanent injunction. If Plaintiffs' prevailed in both, Ametek could then be ordered to pay the amount of the jury's award into an escrow account, develop a remediation plan with the DTSC, withdraw from the escrow account funds as it incurs costs remediating Plaintiffs' properties, and then "[a]ny amounts remaining from the bond/escrow after full implementation of the remediation measures [would] revert back to Ametek." (*Id.*) The Court sees no purpose in ordering Ametek to pay the approximate cost of remediating Plaintiffs' properties into an escrow account if Ametek would be responsible, under an injunction, for paying those costs in the first place. The only reason escrow payments would be useful here would be if there was a danger that Ametek might become insolvent before it finishes remediating Plaintiffs' properties. But Plaintiffs have not suggested, or offered any evidence, that this was the case. Under Plaintiffs' proposed procedure, the "damages" Ametek would be ordered to pay into the escrow account would not be damages at all, because Plaintiffs would never have

In sum, regardless of whether the operative complaint expressly requests injunctive or declaratory relief, the Court can implement those forms of relief if appropriate. Nonetheless, Plaintiffs have expressly requested "leave to amend the Complaint to add injunctive relief." (ECF No. 172 at 23.) After weighing the factors a district court must consider when addressing a motion to amend—(1) prejudice to the opposing party, (2) evidence of bad faith by the movant, (3) whether the movant unduly delayed in bringing the motion, and (4) whether amendment is futile, *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006)—the Court concludes that there is no reason to deny Plaintiffs' request. As discussed above, Ametek will not suffer prejudice as a result of adding requests for injunctive and/or declaratory relief to the operative complaint. There is no evidence of bad faith on Plaintiffs' part in seeking this amendment. Nor did Plaintiffs unduly delay in seeking amendment under the circumstances: Ametek's summary judgment motion was the first time Ametek offered any substantial argument that future remediation damages were not compensable under California law.[18] Finally, amendment would not be futile: if a jury finds Ametek liable, the Court can craft the appropriate remedy to resolve Plaintiffs' legitimate legal claims.[19]

---

any legal claim to those funds. *See Alexander v. McKnight*, 9 Cal. Rptr. 2d 453, 456–57 (Ct. App. 1992) (reversing an award of damages, ordered by the trial court in addition to an injunction against defendants from continuing offensive behavior, because "on the assumption the [defendants] comply with the equitable terms of the judgment, the neighborhood problems will be resolved and the plaintiffs will suffer no damages").

[18] Ametek did make vague references to state and federal statutory "preemption" in its answer to the operative complaint. (ECF No. 40 at 29.) But that assertion was not sufficient to notify Plaintiffs that Ametek believed Plaintiffs' theory of damages was not compensable under California law given the circumstances of this case.

[19] Ametek's separate arguments regarding ripeness and primary jurisdiction can be rejected out of hand. As to the former, Ametek argues that this Court would somehow exceed its jurisdictional ripeness constraints because the California agencies have not reached "final" action with respect to the contamination. (ECF No. 174 at 6–14.) But this suit is not a challenge to any agency action, and any injunction awarded to Plaintiffs in this case would not require any particular action by the California agencies. Rather, as discussed above, any injunction would order Ametek to cooperate with those agencies in trying to better remediate Plaintiffs' properties.

In short, there is no reason under the circumstances of this case to abandon the "extreme liberality" courts must apply when addressing a request to amend a complaint. *Peterson v. Boeing Co.*, 715 F.3d 276, 282 (9th Cir. 2013).

Because Plaintiffs should be permitted under Rule 15(a)(2) to make the amendment they seek, they may, within seven days of the date this order is issued, file an amended complaint that adds a request for injunctive relief. Because declaratory relief is also an available option in this case, Plaintiffs may also add a request for declaratory judgment. Any attempt to amend the complaint in any way other than adding requests for injunctive or declaratory relief, however, must be accompanied by a separate motion to amend.

## IV. Conclusion

The Court concludes that Plaintiffs cannot, under the circumstances of this case, obtain the "future remediation costs" they seek. With respect to that issue, the Court GRANTS Ametek's motion for summary judgment.

---

Ametek's argument that the Court should refrain from addressing Plaintiffs' request for an injunction under the doctrine of primary jurisdiction fares no better. (*Id.* at 14–17.) That doctrine "allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). "[I]t is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (internal quotation marks omitted). "When a district court determines that primary jurisdiction applies, it enables a 'referral' of the issue to the relevant agency," which "means that the court either stays proceedings or dismisses the case without prejudice, so that the parties may seek an administrative ruling." *Id.* at 1115. As an initial matter, it is not clear that the primary jurisdiction doctrine permits federal courts to refer questions of law to state agencies. But even assuming it can, there is no "issue" to be referred to the agencies here. Again, an injunction in this case would require Ametek to cooperate with California agencies to implement a more direct remediation of Plaintiffs' properties. Under those circumstances, the California agencies would still possess final say over what remediation programs Ametek may or may not adopt. The issues presented in this case are run-of-the-mill environmental tort claims, which the Court is "well-equipped to handle." *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124 (N.D. Cal. 2010).

Because at least one form of relief would be available to Plaintiffs should they prevail at trial, the case shall proceed. If Plaintiffs prevail at trial, the Court will then take up the issue of the appropriate remedy.

The Court will hold a pretrial conference with the parties on **May 17, 2018, at 1:30 p.m. in Courtroom 2D**.

**IT IS SO ORDERED.**

Dated: April 12, 2018

Hon. Gonzalo P. Curiel
United States District Judge